1

1                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF FLORIDA
2

3     IN RE:

4     ALEX F. VALLADARES,      CASE NO:  08-13450-BKC-AJC

5              Debtor.
      _____/
6     BARRY MUKAMAL,           CASE NO:  09-1257-BKC-AJC

7              Plaintiff,

8     vs.

9     MIRNA VALLADARES and
      BERTA AEDO,
10              Defendants.
      _____/
11

12

13     FINAL SALE HEARING, CONFIRMATION HEARING RE:
      AMENDED CHAPTER 11 PLAN OF REORGANIZATION (260),
14     EMERGENCY MOTION TO STAY FILED BY DEFENDANTS
             BERTA AEDO, MIRNA VALLADARES (28)
15

16                    September 11, 2009

17

18

19            The above-entitled cause came on for

20    hearing before the HONORABLE A. JAY CRISTOL, one of

21    the judges in the  UNITED  STATES BANKRUPTCY COURT,

22    in and for the  SOUTHERN  DISTRICT  OF  FLORIDA AT

23    LARGE, commencing at or about 10:30 a.m. on Friday,

24    September 11, 2009, and the following proceedings

25                    Reported by:  Lisa E. Brown

2

```
 1                    APPEARANCES:

 2


 3     TABAS FREEDMAN SOLOFF MILLER & BROWN, PA, by
                   GARY M. FREEDMAN, ESQUIRE
 4                  ROBERT MILLER, ESQUIRE
                   On behalf of the Trustee
 5


 6                BEHAR GUTT & GLAZER, PA, by
                    BRIAN BEHAR, ESQUIRE
 7                 On behalf of the Debtor

 8

                  BERGER SINGERMAN, PA, by
 9                 HOWARD BERLIN, ESQUIRE
               ISAAC M. MARCUSHAMER, ESQUIRE
10                          and
                 DAVID R. SOFTNESS, PA, by
11               DAVID R. SOFTNESS, ESQUIRE
               On behalf of Lady of America

12

13                SCHATZMAN & SCHATZMAN, PA, by
                  JEFFREY SCHATZMAN, ESQUIRE
14               On behalf of Berta Aedo and
                       Mirna Valladares

15

16                 HOLLAND & KNIGHT, by
                  JOAQUIN ALEMANY, ESQUIRE
17                RICHARD A. PEREZ, ESQUIRE
               On behalf of the proposed purchaser

18

19                    TRIPP SCOTT, by
                   JOHN G. BIANCO, ESQUIRE
20                On behalf of Regions Bank

21

              ZARCO EINHORN & SALKOWSKI, PA, by
22                  ROBERT ZARCO, ESQUIRE
                 On behalf of Lady of America

23

24              FOWLER WHITE BURNETT, PA, by
                  RONALD G. NEIWIRTH, ESQUIRE
25              On behalf of Stevenson and others
```

3

```
 1        OFFICE OF THE UNITED STATES TRUSTEE, by
               JOHANNA ARMENGOL, ESQUIRE
 2                 Attorneys/Advisor
          on behalf of the United States Trustee
 3

 4               ALSO PRESENT:
            BARRY MUKAMAL (By telephone)
 5        DAVID GERSHMAN, TRIVEST PARTNERS
           CHIP VANDENBERG, TRIVEST PARTNERS
 6      JOHNATHAN ROBERTSON, TG CAPITAL CORP

 7

 8                 -  -  -  -  -  -

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1               THE COURT:  Good morning.  Be seated,
2      please.
3               Good morning, Madam Reporter.
4               COURT REPORTER:  Good morning, Your
5      Honor.
6               THE COURT:  Okay.  We're here on Alex
7      Valladares.
8               Mr. Mukamal wanted to join us by
9      telephone from New York.
10              (The Court conferenced in Mr. Mukamal.)
11              MR. MUKAMAL:  Good morning, Barry
12     Mukamal.
13              THE COURT:  Good morning, Mr. Mukamal.
14     This is Judge Cristol.  We're starting the matter
15     of Valladares, and Mr. Freedman is at the podium.
16              Mr. Freedman, proceed.
17              MR. FREEDMAN:  Thank you, Your Honor.
18     Gary Freedman and Robert Miller, on behalf of
19     Barry Mukamal, the Chapter 11 trustee.
20              Your Honor, first of all, I want to
21     remind the Court that I also have Mr. Mukamal on
22     the cell phone, pursuant to the Court's
23     authorization, so I can confer with him, so I
24     just wanted to remind the Court of that --
25              THE COURT:  Very well.

5

1            MR. FREEDMAN:  -- authorization.

2            There are three matters on the calendar

3    for this morning.  First is the confirmation

4    hearing on the amended Chapter 11 Plan.  As I

5    understood the Court's comments on Tuesday of

6    this week, that most likely will not proceed

7    today based upon various issues that came up on

8    Tuesday's hearing, and, in fact, Your Honor,

9    dependent upon what happens in the auction sale,

10   the Court may never -- perhaps never get to the

11   confirmation issue in this case.

12           The second matter on the Court's

13   calendar is in the Mukamal versus Valladares

14   adversary proceeding, and it's the most recent

15   emergency motion filed in that case by the

16   defendants and the debtor's mother and wife, and

17   that's Docket Entry 28, which is an emergency

18   motion to stop the sale today that's scheduled.

19           And the third matter that I will

20   mention --

21           THE COURT:  To block out the sale?  Are

22   you talking --

23           MR. FREEDMAN:  To stay the sale that's

24   scheduled -- the sale hearing that's scheduled

25   for this morning.

6

```
 1              THE COURT:  That's not how I
 2    understood it.
 3              Mr. Schatzman rises.
 4              MR. SCHATZMAN:  Your Honor, that is not
 5    what we filed.  We filed a motion under Rule 62
 6    to stay execution of the default final judgment.
 7              THE COURT:  That's what I thought it
 8    was.
 9              MR. FREEDMAN:  This is to seek
10    alternative relief, Your Honor.
11              Paragraph 11 and 12, seek to stay the
12    execution --
13              THE COURT:  Well, we'll deal with that
14    very quickly.
15              One, we'll stay the execution; and,
16    two, we won't stop the sale.  Okay?
17              MR. FREEDMAN:  Yes, sir.
18              And the final matter on the Court's
19    calendar for this morning is the final sale
20    hearing, which we believe the Court can proceed
21    on, notwithstanding the motion to vacate the
22    final judgment.  We believe that the Court can
23    proceed with the auction sale on a conditional
24    basis, and what I mean by that is:  The third
25    party purchaser, Fitness Lease and HCAO, if
```

7

1    determined by this Court, to be the highest and
2    best bidder today, have agreed to sit tight until
3    this Court rules on the pending motion to vacate,
4    which we believe the Court can rule on fairly
5    quickly, once it receives the proposed orders on
6    September 21.
7            On the other hand, if the other
8    proposed purchaser, HMC, is the high bidder, we
9    believe that the motion to vacate becomes
10   relatively moot at that point.  But, in any
11   event, we believe that the Court can proceed on
12   that conditional basis.
13           I know that counsel is here for HCAO,
14   and HCO -- HCAO's representative is here.  I'm
15   not sure if anyone is here on behalf of Health
16   Managment Consulting, HMC, but I know that the
17   trustee is ready to proceed today.
18           THE COURT:  Very well.  Mr. Behar?
19           MR. BEHAR:  Yes, Your Honor.
20           Your Honor, as I understood Your
21   Honor's direction, you were going to first hear
22   the status of the movement towards confirmation
23   of the debtor's plan.
24           I would like to report on that as well
25   as to announce to the Judge that the debtor is

8

1    going to be modifying the plan.

2              We were hoping to get the modification

3    filed before this hearing, but there's some small

4    detail that needs to be worked out.

5              But, Your Honor, I can report to you

6    that the modification of the plan is going to

7    include an infusion of an additional $400,000 of

8    cash that is coming in from an absolute total

9    third party.  The name of that third-party is a

10   Florida limited liability company called SCLG

11   Investments, LLC.  The managing member of that

12   limited liability company is a gentleman by the

13   name of Chris Schuk, S-c-h-u-k, I believe is how

14   he spells his name.  He and his attorney are in

15   the courtroom today.  I can report to Your Honor

16   that Mr. Schuk is not a relative of the debtor.

17   Mr. Schuk has never been an officer, shareholder,

18   director, partner, limited partner or agent of

19   the debtor or any of the companies that are the

20   subject of this proceeding, or that the debtor

21   has had an interest in.

22              This is a true third party.

23              THE COURT:  Oh, so the others are false

24   third parties or --

25              MR. BEHAR:  I'm sorry?

1          THE COURT:  You said -- you're

2     suggesting there are other false third parties,

3     that this is a true one?

4          MR. BEHAR:  No.  I mean "true" in terms

5     of coming in with no prior connection that would

6     prevent him from operating the gyms going

7     forward.

8          THE COURT:  Okay.  But -- all right.

9     You're wasting our time, Mr. Behar.

10         Nothing is before the Court on that

11    matter, and whether it gets before the Court or

12    not, we'll see.

13         But we're here on two things today.

14    One was to be a sale and two, was to be a

15    possible confirmation to see which was the better

16    way to go.

17         Now a problem arose at the last

18    hearing, and that was the question of:  What did

19    the plan provide?

20         And I asked for orders in regard to

21    clarification of what was in the plan regarding a

22    three tranches of money.

23         A proposed order was received on behalf

24    of the trustee, submitted by Mr. Berlin, in which

25    the form of the order was not satisfactory, and

10

1    the Court did not enter it.

2           You failed to submit an order, but you

3    faxed in or e-mailed in a totally inappropriate

4    comment on the order by striking out everything

5    in it without any explanation, which will

6    be totally ignored by the Court.

7           But here's where we are.  The Court has

8    examined these three tranches of money, and --

9    I'm sorry.  I've got so many things cooking that I

10   hope I don't get this mixed up.  But, basically,

11   the first tranche of money was the $323,000

12   that's in the trustee's account, and the Court

13   is of the opinion that that money is property of

14   the estate and cannot be used in support of the

15   proposed plan.

16          The second tranche of money, that was

17   $227,000, appears to the Court to be from an

18   independent source, not property of the estate,

19   and that $227,000 could be used in support of the

20   plan.

21          And then comes the final tranche, the

22   $450,000.

23          And the question is:  Is that property

24   the estate, or is it not?   And I'm unable

25   to determine that at this point.

1           So the simple solution to the problem

2    at hand that I see at this moment is as

3    follows:

4           That we have one scenario in which

5    the 227 is the only money in the plan, in which

6    event a bid over 227 would obviate the necessity

7    of going over the plan.

8           Second would be that the 227 and the

9    450 are in the plan.  And, as I say, we can't

10   determine that amount today, but that would

11   mean that there would be 677 in the plan.

12          And so, if we take bids, and if the

13   bidder bids over 677, then there's nothing more

14   to talk about.

15          If we -- if the bid is below 677 and

16   227, then the only -- nothing can be determined

17   until we determine where that 450 goes.

18   And if the bid is below 227, then, of course, we

19   need to talk about whether or not the plan can be

20   confirmed.

21          So that's where I see us going today,

22   and I think the first thing we need to do is find

23   out what, if any, the bid is.  And if the bid

24   preempts the reorganization, then we move

25   forward.

12

1          Mr. Freedman?

2          MR. FREEDMAN:  Yes, Your Honor.

3          THE COURT:  Mr. Neiwirth, do you

4    have --

5          MR. NEIWIRTH:  May it please the Court,

6    Your Honor.  Ronald Neiwirth, on behalf of

7    Hoyt Stevenson and others.

8          Your Honor will recall that they are

9    interested parties in here for a couple of

10   reasons.  One of them is because Stevenson and

11   the others own 50 percent of one of the entities

12   which the trustee is trying to sell, and that is

13   Fitness Clubs of America, LLC; and the other is

14   that they are in part financiers of the plan to

15   the tune of the $227,000 which I'm holding.

16         There are several objections out there

17   to the sale order as well, Your Honor, and I

18   just wanted to remind the Court that there are

19   still objections and issues pertaining to the

20   sale order and the sale proposal.

21         THE COURT:  Well, we can deal with them

22   at the appropriate time.

23         If the bid is only $100,000, it's all

24   moot.

25         MR. NEIWIRTH:  No.  It's just that I

1   didn't want to let the record sound as if there

2   were not also objections.

3            THE COURT:  We'll try to deal with

4   everything.  But this is a complicated mess with

5   massive allegations of slime, and we need to wash

6   off the slime, and sort out the issues, and

7   determine where we're going.

8            So the first question before the Court

9   is whether or not there's any substantial

10  potential bid out there that would make further

11  proceedings unnecessary or -- and, of course, we

12  still may have some objections to be heard,

13  if we find out that that's the case.

14           If the bid is non-existent, then we

15  need to talk about the plan.

16           MR. NEIWIRTH:  Of course.  But,

17  regardless of the bid, the objections remain.  So

18  I'll sit back and wait.

19           THE COURT:  Well, refresh my memory.

20  What objections are you talking about?

21           MR. NEIWIRTH:  Your Honor, there are at

22  least three that I saw, the debtor had, we had,

23  and the wife and mother also had.

24           The general nature of our objection --

25  if Your Honor wants to hear a little preview,

14

1   I'll be happy to point --

2           THE COURT:  I don't want a preview.  I

3   just want a one-sentence explanation of what it

4   is.  What was the objection to?  What was the

5   basis of the objection, not the full-day's

6   evidentiary presentation.

7           MR. NEIWIRTH:  Not the full-day's

8   presentation, Your Honor.

9           The proposed sale, for example,

10  particularly, where it concerns Fitness Clubs of

11  America, the debtor, and now the estate, owns 50

12  percent of that particular LLC.

13          The debtor was a managing member as is

14  Hoyt Stevenson.

15          Nevertheless, the sale proposes to be

16  free and clear of the existing operating

17  agreement of the LLC.

18          It proposes that the purchaser gets 100

19  percent of the management, and 100 percent of the

20  cash flow.

21          And, remember, that that LLC is not a

22  party to the bankruptcy case.  It's not a debtor.

23  And one of the primary objections is that, quite

24  simply, you can't ride rough shod over the

25  other 50 percent shareholder by giving someone

15

1    that purchases 50 percent of the company,

2    contrary to its operating agreement, because the

3    operating agreement requires consent of the other

4    members, and then giving this new entity 100

5    percent control and 100 percent of the cash flow.

6            We believe firmly that the Court lacks

7    the power to do that, under any circumstances.

8    That's the particular and parochial objection

9    that we have on behalf of the company.

10            And we find that objection --

11            THE COURT:  The sale is the sale of the

12    debtor's interest, not the sale of the companies.

13    And so if -- let me -- correct me if I'm wrong,

14    but you'll get the debtor's interest in the

15    company were it sold, and it is subject to that

16    50 percent agreement.  That's the problem of the

17    buyer, as I see it.

18            What about it?

19            Who represents the buyer, and what is

20    your analysis of this claim?

21            MR. NEIWIRTH:  Your Honor, if I may --

22            THE COURT:  Well, let's talk about this

23    first, before we move onto the next one.

24            MR. NEIWIRTH:  Yeah, but that's not

25    what the contract says that everybody signed.

16

1           The contract said -- the contract

2    arguabley says, "Free and clear of interests," but

3    the way they define "interests" in the contract

4    would include any limitations or what have you

5    that come up in the operating agreement.

6           MR. FREEDMAN:  Your Honor, what I was

7    about to do, before Mr. Neiwirth raised -- arose,

8    was to go through the agreement, and at a certain

9    point, I think I can clarify the issues and

10   concerns that Mr. Neiwirth has, that if I had the

11   opportunity --

12          THE COURT:  Well, we'll give you that

13   opportunity.

14          First, counsel for the prospective

15   buyer, what's your understanding of what it is

16   you're buying?

17          Do you understand what Mr. Neiwirth is

18   suggesting in regards to this particular unit?

19          MR. PEREZ:  Judge Cristol, my name is

20   Richard Perez.  I'm here with Joaquin Alemany

21   from Holland & Knight.

22          There is a question, and we think it

23   ultimately will be a question for another court

24   to decide, as to whether who -- to who that cash

25   flow belongs.

1          I believe Lady of America's position

2     will be that or is that Alex Valladares

3     personally owns the cash flow of the clubs.  And

4     so there is an issue, an issue that's not before

5     this Court as to who --

6          THE COURT:  Well, that's what I --

7     that's the way I -- I thought I saw it.  And so

8     we are agreed that the buyer is buying the

9     interest of Mr. Valladares.  And if that interest

10    is not the 100 percent, then that's a problem

11    between Mr. Valladares and the person who's

12    claiming the other 50 percent; is that correct?

13         MR. PEREZ:  That is correct, Judge.

14         THE COURT:  All right.  So then that

15    solves that objection.

16         Since that is not an issue, what

17    about it,  Mr. Freedman, we'll hear your

18    clarification, and then we'll let

19    Mr. Neiwirth come up with anything further that he

20    has.

21         MR. FREEDMAN:  Yes, sir.

22         I'd like to hand up to the Court two

23    documents.  One is the purchase agreement.  I

24    have extra copies, if anyone in the courtroom

25    needs one, and I also have a comparison of the

18

1  two offers that we prepared prior to the Court's

2  comments, obviously, this morning, but I think

3  it may be helpful in going through the offer.

4          So if I may I present both of those?

5          THE COURT:  You may.  Thank you.

6          MR. FREEDMAN:  Thank you.

7          MR. BEHAR:  Your Honor, is there an

8  extra copy of the comparison?

9          THE COURT:  Mr. Behar would like a

10  copy, I presume.

11          MR. FREEDMAN:  Does anybody else want

12  one?  Pass them around, please.  Thank you.

13          Okay.  You can see from the purchase

14  agreement, Your Honor, that the proposed

15  purchaser's client is a client by the name of

16  Fitness Lease Management, LLC and HCOA Franchise

17  Holding, LLC, and I'll talk in a moment about

18  who those entities and what those entities are.

19          The interests that they're being

20  acquired are those that are identified in the

21  bottom, the whereas clause, and comports with the

22  Court's sale procedures order.  The only point of

23  clarification is -- it did come up Tuesday -- and

24  if I say this wrong, I ask that the proposed

25  purchaser stand up and correct me.

```
1              But in respect to the cash flow as
2    indicated with respect to the franchise right,
3    it's my understanding that the proposed purchaser
4    is not asserting any greater rights in revenues
5    than Mr. Valladares would have as the owner of
6    those interests so --
7              THE COURT:  Isn't that exactly what I
8    just said --
9              MR. FREEDMAN:  Yes, sir.
10             THE COURT:  -- that if they were
11   selling the interest of Mr. Valladares, and if
12   it's subject to claims, that's a problem for the
13   buyer to deal with the party that might be
14   claiming an interest in what you believe may be
15   all going to Mr. Valladares, or part of it, o
16   or none of it?
17             MR. FREEDMAN:  Yes, sir.
18             THE COURT:  And so if, really,
19   Mr. Valladares had no interest in that cash flow,
20   the buyer may have bought nothing.  But the
21   trustee is not warranting anything, only selling
22   what interest the trustee has.
23             MR. FREEDMAN:  And directly to that
24   point, Your Honor, if the Court looks at Page 4,
25   Section 2.1, the bottom line, certifies that the
```

20

1    assets are being sold "as is," without any

2    representations or warrantees of any kind.

3              Then, if the Court would flip to Page

4    5, under Section 2.2, there is a discussion with

5    respect to the current revenue processor,  I

6    believe that would be Mr. Neiwirth's client, and

7    giving the potential purchaser the opportunity to

8    negotiate a deal with that processor, and, if

9    that deal can't be reached --

10             THE COURT:  I haven't understood a

11   thing you said.  Let's start again.

12             MR. FREEDMAN:  Yes, sir.  On Section --

13             THE COURT:  On Page 5, what about it?

14             MR. FREEDMAN:  On Section 2.2, on Page

15   5, discusses the current arrangement with a

16   revenue processing company by the name of NFFS,

17   which is Mr. Neiwirth's client.

18             This agreement provides the opportunity

19   for the purchasers to negotiate with NFFS an

20   agreement that is satisfactory to both sides

21   and, if not, it requests that the trustee move to

22   reject that agreement.

23             And I'll discuss how that's going to be

24   treated in a moment.  But I'm just highlighting

25   that to the Court, because it involves

21

1   consideration issues.

2           So getting directly to the

3   consideration, Your Honor, under Section 3.1,

4   there will be a cash payment made of a hundred

5   thousand dollars.  Then, over the next 12 months,

6   on a monthly basis, the purchaser will provide to

7   the trustee three percent of gross revenue as --

8   that's described, with a true-up at the end of

9   the year, and the true-up relates to the fact

10  that the minimum -- minimum earn out that's to be

11  paid to the estate under this agreement at the

12  end of the year be $450,000.  It may be more than

13  $450,000, time will tell, but it can't be less

14  than $450,000.

15          Then moving to Subsection C, it's my

16  understanding -- again, I invite the purchaser to

17  stand and correct me if I'm wrong, but they did

18  acquire, and the Court was aware that there was a

19  significant secured creditor by virtue of a

20  judgment lien that was asserting a lien right in

21  all of the debtor's interest in these entities,

22  and it was concluded by everybody before this

23  Court that there was no way to avoid that.  So it

24  was something that was going to have to be dealt

25  with.  The debtor discussed it in his plan.

22

1              THE COURT:  That's the Manesis claim?

2              MR. FREEDMAN:  The Manesis claim, Your

3    Honor.  That's correct.

4              And an affiliate of the purchasers --

5    again, my understanding is they acquired that

6    claim, and they stood up before the Court and

7    made that announcement a couple of days ago -- I

8    believe it was Tuesday.  So, therefore, the

9    value, in respect to that claim, this purchaser

10   is assuming, so there is no further obligation to

11   this creditor, Manesis and the value that's being

12   ascribed is the same value that the debtor

13   ascribed to it, $300,000.

14             And then moving to Subsection D, that

15   deals with an NFFS issue that provides that if

16   the agreement is rejected, whatever pro rata

17   distribution that NFFS would be entitled to

18   would be paid or funded by the purchasers.  So

19   that's an additional consideration for an

20   agreement to move to reject that agreement.

21             There are additional monetary

22   components, I believe, in respect to this

23   agreement, that's not on the face of the

24   agreement, but it's a point for the Court to

25   consider, and it's referenced in the comparision.

23

1          First of all, the Court heard on
2    Tuesday -- and Mr. Berlin raised the issue in
3    respect to the motion to quantify Lady of
4    America's claim, that they had filed a claim in
5    excess of $3 million, a portion of that's
6    already been incurred, and a portion of it would
7    be incurred upon the termination or the
8    confirmation of the debtor's plan.
9          Lady of America has agreed that if HAOC
10   and Fitness Management is the successful
11   purchaser --
12          THE COURT:  Is it HCOC or HCOC?
13          MR. FREEDMAN:  HCOA.  I apologize, Your
14   Honor.
15          If those two entities are the
16   successful purchasers, that Lady of America will
17   waive its $3 million claim in full.
18          There need not be any litigation in
19   respect to the claim.  That claim will not be
20   asserted, and a potential $3 million liability to
21   this estate goes away.  And that's significant,
22   Your Honor, because I added up the amount of the
23   Class A unsecured claims pursuant to the
24   affidavit and tabulation of votes that Mr. Behar
25   filed yesterday, and based on that, there are

1    $4 million of general unsecured claims.

2           Lady of America would be another

3    $3 million on top of that.  So the reduction

4    and waiving of that claim is significant in

5    the context of this matter.

6           Then finally, the Court also heard that

7    Lady of America had filed a State Court action

8    against all the entities, and part of that action

9    was to attack the $450,000 that the Court

10   mentioned at the beginning of the hearing,

11   regarding whether it belongs to HMC, the

12   principals of HMC, or whether it's actually the

13   property of the estate, and the purchasers also

14   had taken the position that perhaps those were

15   revenues that belonged to the underlying

16   entities.

17          Both parties -- all three parties, that

18   is, Lady of America, Fitness Lease, and HCOA,

19   have agreed that they support that those funds

20   are the property of the estate.  They will

21   support the trustee's efforts to obtain a court

22   adjudication that that $450,000 is the property

23   of this estate.

24          So all in all, you can see by the

25   analysis -- and we -- actually, I think, was

1    trying to be genuine in our analysis, Your Honor,

2    because with respect to the $450,000, we gave the

3    Court three scenarios.  One, put, consider it in

4    full, give it full credit, give it 50 percent

5    credit, or give it no credit.  And under all

6    three scenarios, we still believe with all the

7    scenarios and concessions I just mentioned, that

8    the offer that's currently on the table by HCOA

9    and Fitness Lease Management is higher and

10   better.

11            The only other thing I want to tell the

12   Court, and I want to proffer this to the Court,

13   is Mr. Robertson is in the courtroom.

14   Mr. Robertson is the principal of these entities,

15   as I understand it.  Mr. Robertson, Johnathan

16   Robertson, that is, will oversee the operations.

17   He's a UNC undergrad with a Harvard graduate

18   degree.  He's the principal of TG Capital

19   Management.  He's been the manager of that

20   entitiy -- managing director for ten years.

21   TG Capital Corp is an investment company with

22   offices in Miami, New York, Los Angeles,

23   investing in both operating businesses and real

24   estate projects.  TG Capital buys companies that

25   are both well functioning and ones in distress

1    and needs of capital or management or both.  They

2    have significant experience in bankruptcy

3    auctions.  TG has, at any given time, about ten

4    owned companies, the smallest of which currently

5    makes $1 million, I'm assuming that's annually,

6    and the largest of which is $250 million annually

7    in net profits before tax.  They have also real

8    estate -- over ten real estate projects.  They

9    have experience buying assets out of bankruptcy.

10    They have served as a stalking horse in numerous

11    bankruptcies, including SEO, the Betsy Ross

12    case in front of Judge Mark, and have

13    bought multiple companies out of bankruptcy,

14    including Elite Modeling, Fastmart.  They have

15    ten years plus in experience buying companies out

16    of bankruptcy and have never had any company that

17    they have an interest in file for bankruptcy.

18            In respect to their experience in

19    operating gyms, TG has built gyms and operated

20    and sold at Williams Island.  They currently

21    operate a gym at Acqualina Resort and Spa here in

22    Miami.

23            A gentleman by the name of Wally Hall

24    who's served on its board who has -- was the

25    former CEO of Annie's Sports and Racquet Clubs

1    and Health Tract with 17 clubs.

2              They have a great deal of experience in

3    retail including CFK, Levi's, GAP --

4              THE COURT:  Mr. Freedman, this is all

5    interesting, but it really has nothing to do with

6    the numbers of what I'm going to do here if we

7    have a sale or if we have a confirmation.

8              MR. FREEDMAN:  I'll stand down.

9              THE COURT:  If those folks were the

10   components of the plan, this would be material to

11   the management aspect of 1129 criteria, but the

12   fact that they're buyers, they may be all you

13   say, or they may be nothing.

14             MR. FREEDMAN:  The only reason --

15             THE COURT:  But the words that came

16   from that famous movie "Show me the Money,"

17   that's what we're talking about here today.

18             MR. FREEDMAN:  I understand, Your

19   Honor, and the only reason I bring it up is

20   two-fold -- and one thing I forgot to mention,

21   one is, as I indicated, the $450,000 has got to

22   be paid out in equal -- in monthly payments over

23   a year.  So I thought the Court ought to

24   understand who the purchasers are, and that they

25   are experienced in these type of businesses so

28

1    that there is some credence in the fact that

2    those monies are going to be paid out.

3            THE COURT:  Where is that in the sale

4    order that it requires that they prove anything

5    of that nature?

6            MR. FREEDMAN:  There is a provision

7    showing -- asking that they show the financial

8    wherewithal, Your Honor.  And that's one of the

9    reasons why I'm proffering -- what I was

10   proffering.

11           The other thing I forgot to mention is

12   that the sale agreement also provides that the

13   trustee will take back its security interest in

14   the interests that are being conveyed as security

15   for that $450,000 payment.

16           So that's why I was proffering what I

17   was.  But that's the presentation, Your Honor.

18           If the Court has any questions of me,

19   I'm happy to answer them.

20           THE COURT:  Very well.  No questions.

21           MR. FREEDMAN:  Thank you.

22           THE COURT:  What's next?

23           MR. FREEDMAN:  I know Mr. Mukamal is on

24   the phone.  I don't know if he has any

25   comments --

29

```
 1              THE COURT:  Mr. Mukamal, anything?
 2              MR. MUKAMAL:  No, Your Honor, not at
 3    this time.
 4              THE COURT:  All right.  Mr. -- well
 5    both of you, whoever wants to come up, come on
 6    up.
 7              MR. ALEMANY:  Your Honor, Joaquin
 8    Alemany, on behalf of the purchasers.  In the
 9    sua sponte order, it does clarify that the
10    Court would consider both offers by looking at
11    the total net consideration to be received on the
12    sale, the relative ability of the bidder to
13    timely close on the sale, the financial
14    wherewithal and relative ability of the bidder to
15    pay any amounts due after the closing, and the
16    relative impact on creditors --
17              THE COURT:  All right.
18              MR. FREEDMAN:  So maybe that then --
19              MR. BEHAR:  You had mentioned bearing,
20    but, at this time, unless we know that there's a
21    potential sale, it really is --
22              MR. ALEMANY:  There is a potential
23    sale, Your Honor.  It's the purchase agreement
24    that --
25              THE COURT:  Well, we don't know -- do
```

1   we have a number yet?

2               What is the offer on the sale?

3               MR. ALEMANY:  The amounts that we're

4   paying are the hundred -- the hundred thousand

5   dollars, and that's $35,000 that's on deposit

6   with the trustee, plus $65,000, which is on

7   deposit in the Holland & Knight trust account.

8   So that totals a hundred thousand dollars.

9               Additionally, we have a three percent

10  of gross revenue per month commitment for the

11  next 12 months, and at the end of that 12-month

12  period, if it doesn't add up to $450,000, we

13  would true-up that amount.  So it's a minimum

14  commitment of $450,000 within the next 12 months,

15  starting on the 30th of the month, following the

16  closing of the sale.

17              Additionally, we have satisfied the

18  $300,000 secured claim for the Class 3 claim of

19  Yamine Manesis.  That's an equivalent of

20  providing $300,000 to the estate.

21              And we are committing to pay the

22  rejection claim in the unsecured creditor

23  percentage return, and that's what Mr. Freedman

24  was referring to.

25              THE COURT:  Can we quantify that?

```
 1              MR. ALEMANY:  We can't qualify that,
 2    because the Class 8 unsecured creditors, we don't
 3    know what the allowed claims are going to be --
 4              THE COURT:  Do we have a range?  I
 5    mean, a dollar, a million dollars?
 6              MR. ALEMANY:  It would be whatever the
 7    rejection claim is times the allowed amount of
 8    the unsecured claims -- I'm sorry -- the amount
 9    available for unsecured claims over the -- I'm
10    sorry.
11              We estimate it to be approximately
12    $50,000.
13              The rejection claim would be $200,000,
14    but, after going through the formula, it would
15    be --
16              THE COURT:  All right.  On the formula
17    of a $300,000 secured claim, is that allowable
18    as $300,000, or does that get reduced in
19    any way as to what the value is of this
20    transaction.
21              MR. ALEMANY:  The claim amount is for
22    $538,000, but the debtor's counsel had negotiated
23    a settlement agreement with the Yamine Manesis to
24    reduce that amount to $300,000.
25              THE COURT:  And so that $300,000 is
```

1    300,000 hard dollars?

2              MR. ALEMANY:  That's correct.

3              THE COURT:  So a hundred four-fifty and

4    300 looks like $850,000; is that correct?

5              MR. ALEMANY:  That's correct, Your

6    Honor.

7              And in addition to that --

8              THE COURT:  And nevermind, without

9    looking at the $50,000, more or less.

10             MR. ALEMANY:  And without looking at

11   the $450,000 that the ownership of is at issue.

12             THE COURT:  Well, that would be a

13   separate matter.  I mean, if that belongs to the

14   estate, that would be an additional sum that

15   would be paid to the creditors.  And if doesn't

16   belong to the estate, it would go to whoever it

17   goes to.  That has nothing to do with this

18   transaction.

19             So let me ask Mr. Behar.  Mr. Behar?

20             MR. BEHAR:  Yes, sir?

21             THE COURT:  This looks like we're

22   talking about a hard 850 here, which seems to be

23   in excess of the 677, even if you were allowed

24   the 450.

25             MR. BEHAR:  Your Honor --

33

```
1              THE COURT:  Oh, but Mr. --

2              MR. NEIWIRTH:  Your Honor, if I could

3    help out, because Mr. Behar had me working on

4    numbers.

5              We also made a chart, if I might

6    approach --

7              THE COURT:  Certainly.

8              MR. NEIWIRTH:  -- and hand one up and

9    pass them around.

10             THE COURT:  And the chart that I've

11   been given by Mr. Freedman seems to include the

12   323 in the debtor's plan, which I've indicated,

13   appears to the Court to belong to the estate and

14   is not -- cannot be used in the debtor's plan.

15             Well, in any event, let's look at your

16   chart.

17             MR. NEIWIRTH:  All right.  If Your

18   Honor, please, we tried to analyze this in

19   bankruptcy terms to keep life simpler.

20             The first item of available resources

21   here is the amount of money the trusee is holding.

22   And as between the two situations, the sale or

23   the plan, that's a wash, because that's the same

24   in either event.

25             In other words, it's got nothing to do
```

 1   with the sale.

 2              THE COURT:  And is that not the 323?

 3              MR. NEIWIRTH:  Yes, it is.

 4              THE COURT:  Okay.

 5              MR. NEIWIRTH:  We just didn't know

 6   exactly how much is left, because about two

 7   hundred and something thousand of it went out to

 8   fees already.

 9              MR. MUKAMAL:  Mr. Neiwirth, there's a

10   hundred and five thousand of that left.

11              MR. NEIWIRTH:  Thank you, sir.

12              So out of the 323 or some-odd, there

13   still remains 105, according to Mr. Mukamal.

14              But in either scenario that's the

15   same, because that's already property of the

16   estate, so we count that as a zero.

17              THE COURT:  Okay.  All right.

18              MR. NEIWIRTH:  On the 363 sale's side,

19   Paragraph 3.1(a) of the contract has a

20   hundred thousand dollars deposit, so we posted

21   that as a deposit.

22              On the other hand, on the debtor's

23   side, we posted as of this moment, Mr. Behar

24   is holding $450,000, and I'm holding $227,000.

25              THE COURT:  And that's the issue is

1    unknown, whether it's in or it's out.

2          MR. NEIWIRTH:  Well, at the present

3    time, Your Honor, we deal with what is rather

4    than everybody's allegations.  Right now it's

5    available for this plan.

6          THE COURT:  Well, is it available for

7    this plan?  If it belongs to the estate or to a

8    third-party rather than -- or if it belongs to a

9    third party who's kicking it in, that's one

10   thing, but if it belongs to the estate and not

11   a third party, then it doesn't belong in there.

12         MR. NEIWIRTH:  But, Judge, at this

13   juncture, that's an allegation.  That's not a

14   fact --

15         THE COURT:  I understand.  That's why I

16   said that.

17         MR. NEIWIRTH:  -- that no one has taken

18   a position --

19         THE COURT:  That remains an unknown.

20   We can't -- I don't know how we can deal with

21   that until we have some sort of an evidentiary

22   hearing on that issue.

23         MR. NEIWIRTH:  I must tell you, Your

24   Honor, that litigation counsel for LOA sent me a

25   letter the other day, and disputed the $227,000

1    that I'm holding, claiming that it was

2    fraudulently transferred from somewhere.

3              So if you let them go by allegations --

4              THE COURT:  No.

5              MR. NEIWIRTH:  -- instead by proof,

6    then everything is in doubt.

7              THE COURT:  I understand.  But when

8    allegations are made, until they are adjudicated,

9    matters remain at issue and not resolved.

10             MR. NEIWIRTH:  And that brings me to

11   the next part.

12             THE COURT:  All right.

13             MR. NEIWIRTH:  Manesis.  Counsel, I

14   believe, I misspoke a moment ago.  The reason why

15   I say that is because counsel has filed papers

16   indicating that they purchased Manesis' claim.

17             In front of you just now, he said they

18   paid Manesis' claim already.

19             THE COURT:  Well, let --

20             MR. NEIWIRTH:  Either way, I think it

21   comes out the same, that $300,000 was the

22   settlement amount.  So I think it's more or less

23   of a moot point.  I was just clearing the record

24   of inconsistencies.

25             THE COURT:  Well, I mean, if they paid

37

```
1    the claim, and it's no longer an obligation of
2    the estate, that was a generous gift.  However,
3    considering the fact that skilled professionals
4    are dealing with this, I sort of suspect that
5    they took an assignment of claim rather than
6    paid and satisfied the claim.
7              MR. NEIWIRTH:  They did, Your Honor.
8    They took an assignment in a third entity which
9    is not listed as one of the purchasers, and they
10   filed a notice of assignment of the claim --
11             THE COURT:  Okay.
12             MR. NEIWIRTH:  -- in Court.
13             But either way, we're still counting
14   that as $300,000.
15             THE COURT:  Uh-huh.
16             MR. NEIWIRTH:  Now, the next thing is
17   the earn out.  And the issue with the earn out is
18   a couple of things.  First of all, it's going to
19   take a year or more than a year to get there.
20   Under the terms of the contract, which Mr. Behar,
21   pried out of everybody earlier this week.  The
22   earn out it a floor it said of $450,000.  There
23   was some ambiguity about whether that 450
24   included the 100 and 300 we already spoke of or
25   not.
```

38

1          I think Mr. Freedman cleared that up.
2   He says, "It's in addition to."
3          THE COURT:  That was my understanding
4   of what he represented.
5          MR. NEIWIRTH:  But what I did on the
6   chart, basically is because it's not actually due
7   until 15 months from now, in the version of the
8   contract I saw, I discounted it by 10 percent,
9   because that's a year and a quarter at eight
10  percent per annum; made it 405 instead of 450.
11         There's no equivalent earn out in the
12  debtor's plan proposal other than future
13  dividends.  And all we're talking about is what
14  kind of cash will the creditors get on
15  confirmation?
16         I'm looking at everything else as being
17  a future item.
18         MR. BEHAR:  I think your analysis of
19  reducing the 450 to 405 is meritorious.
20         MR. NEIWIRTH:  Thank you, Judge.
21         Now with respect to Item 5, the
22  rejection claim that was just discussed about
23  NFFS, if the plan goes, then there is no
24  rejection claim, because NFFS isn't rejected, so
25  I'm treating that as being equal.  It doesn't

1    help one or hurt the other either way.

2              Now I was interested to hear just now

3    that LOA would waive its claim if there was a 363

4    sale.  I haven't seen anything in writing to say

5    that until Mr. Freedman got up and said it just

6    now.  I hadn't heard that from anybody, either.

7              So I have the LOA claim listed as not

8    waived in either event.  And that's the reason

9    why I have it listed that way.

10             Number 7 item is the debtor has found a

11   complete third party who is willing to put in

12   400,000.  His lawyer's in court today.

13             THE COURT:  Is the $400,000 here in the

14   courtroom in a suitcase?

15             MR. NEIWIRTH:  If he did that, he'd

16   probably have to file papers with the IRS.  I

17   don't believe so, Your Honor, but his lawyer is

18   here --

19             THE COURT:  Well, then I don't think

20   we're going to be talking about that 400,000.

21   There's nothing on file.  The fact that somebody

22   stands up and says that they plan on putting in

23   $400,000 is interesting, but it's got nothing to

24   do with this hearing today.  It's too little, too

25   late.

1          Go ahead.

2          MR. NEIWIRTH:  And the other thing that

3   the trustee doesn't reflect is that there is some

4   finality to this.

5          If Your Honor approves the sale, as you

6   say, of them buying "as is, where is," number

7   one, that's just going to provoke more

8   litigation.

9          An example of that is Fitness Clubs of

10  America, where this document treats -- the sale

11  documents, that is, treats the operating

12  agreements of these limited liability companies,

13  essentially, as liens.

14         It defines them in such a manner as it

15  would purport to sell free and clear liens, but

16  then the contract defines "liens" as being -- let

17  me pull out the exact language.

18         I'm looking at the proposed sale

19  contract, the version that was circulated the

20  other day on Page 3.  It says, "Lien, means any

21  lein, security interest, pledge, hypothocation,

22  encumbrance, title defect, conflicting or

23  adverse claim of ownership."

24         If it stopped there, I would be just

25  fine with it, because that's probably what the

1   lien or interest would be in bankruptcy speak as

2   well.

3          THE COURT:  What page are you on?

4          MR. NEIWIRTH:  I'm on Page 3 of the

5   proposed sale agreement.  There's a definitional

6   term that says, "Lien."

7          THE COURT:  Okay.  Go ahead.

8          MR. NEIWIRTH:  All right.  But after

9   that adverse claim of ownership -- which isn't

10  really a lien, it's probably an interest in

11  bankruptcy language -- it goes on to say,

12  "including any transfer restrictions or any

13  interest arising as a result of such transfer

14  restriction."

15         In other words, the operating agreement

16  which is attached to our objection to the sale

17  order, indicates that no one is allowed to become

18  a member of this LLC without permission of the

19  other members.  And this purports by defining a

20  portion of the operating agreement as a lien,

21  to say, "free and clear of liens," means we can

22  forget all of that; just do whatever we want.

23         And there's further language in that

24  same paragraph that talks about any options or

25  rights to purchase assets further down, whether

42

1    arising by agreement, statute or otherwise.

2                Now -- then it continues on in a

3    similar vein further along in the document.  I'm

4    finding the spot.  It's 30 pages.  It took a

5    while to get through all of this.

6                You have two sets of contradictory

7    issues here.

8                You have this purchase, supposedly,

9    picking up franchise rights.  You have LOA, which

10   has steadfastly for the last year and a half,

11   trumpeted, that there are no franchise rights,

12   that these franchises were all extinguished and

13   exterminated before the bankruptcy started.  So

14   there's nothing to assume and assign.

15               There's nothing in here about

16   assumption and assignment.  And, in fact, they

17   make the representation that they picked up

18   separate franchises from LOA.

19               They're trying to have everything both

20   ways.  They're alleging everything on both sides

21   of the fence.

22               THE COURT:  Isn't that what everybody

23   always wants to do?

24               MR. NEIWIRTH:  Well, naturally, Your

25   Honor.  But somewhere along the line, allegations

43

1   are not facts, nor are things like this in

2   contracts, where they say very blithely, "Free

3   and clear.  We're taking it free and clear of

4   liens."

5           Now, if that's all they said, "Free and

6   clear of liens," we understand what liens are.

7           But the way they're defining "liens,"

8   arguably takes in the entire operating agreement

9   of the LLC and --

10          THE COURT:  Well, let's allow -- I'll

11  allow someone to comment on that from the

12  opposite position and see if there is a meeting

13  of the minds or two different interpretations.

14          MR. NEIWIRTH:  But shall I conclude

15  this part, and then look for the comments, Your

16  Honor?

17          THE COURT:  Well --

18          MR. NEIWIRTH:  In the end, Your Honor,

19  the trustee's proposal, the 363 sale, number one,

20  is going to leave this case open for a minimum of

21  probably another year and a half.

22          THE COURT:  Well, I'd say a lot longer

23  than that.

24          MR. NEIWIRTH:  I think so, too, because

25  a 363 sale would completely eradicate the

44

1    possibility of Mr. Valladares reorganizing.  It

2    would also leave the trustee with a huge pot of

3    money to go litigate, and he does, indeed,

4    estimate considerable expense for litigation

5    afterwards, which wouldn't happen if the debtor

6    is allowed to confirm his version of a plan.  And

7    also, it's not as obvious, but under the sales

8    scenario, the purchaser would give back a lien on

9    the equity interest in the various corporations

10   that it's purchasing in order to secure that earn

11   out payment.

12         Meanwhile, each of these underlying

13   corporations has its own debts, has its own

14   assets.  The plan provides for payment of a great

15   deal of those to the tune of a couple of million

16   dollars, which has been guaranteed by

17   Mr. Valladares.

18         The sale says nothing about what's

19   going to happen downstream, actually, in those

20   corporate entities.

21         There's a lot more going on here, Your

22   Honor, than just the consequences of the price

23   for which this is sold.

24         If they choose to default down on the

25   corporate level, then you have a bunch of

45

1    guarantee claims to the tune of almost

2    $2 million, which instead of being treated by the

3    plan as being paid outside the plan and then not

4    receiving a dividend through the case, would suddenly

5    be knocking on the door saying, "We are diluting the

6    yield to the other unsecured creditors."

7            You have a similar situation.  They got

8    up just now and said, "Oh, LOA will waive its

9    claim in the sale."

10           And that's not in the sale papers.

11   That's not in the order.  That's not in the

12   contract.

13           Now I would be rather interested to

14   know whether this company, TG Capital, is

15   affiliated in any way with LOA or its parent

16   company, and I didn't hear anybody say anything

17   about that yet.

18           But all in all, Your Honor, there is

19   considerably more to this that than meets the

20   eye.  The debtor has moved a whole lot in order

21   to get this far.  He's kept the place alive.

22   He's been paying royalties despite the fact that

23   LOA has claimed that the franchises have been

24   cancelled.  So he's been mitigating their damages

25   as it were right along.  But in the end, if you

46

1   have to do it on a balance sheet, you have to do

2   it on what's today.  And today the trustee's got

3   money in his hands that doesn't count on either

4   side of the score, because he's already got it.

5            Mr. Behar's got 450 that someone's

6   complaining about, but they haven't proven any

7   complaints about.

8            I've got $227,000.  And I received

9   a letter putting me on notice that they

10  want to make a complaint about that.  I mean,

11  they want to make a complaint about everything.

12           THE COURT:  That's why there's so many

13  people in this room.

14           MR. NEIWIRTH:  Yes.  And we're

15  outnumbered by quite a bit, because I think that

16  LOA's probably got at least five lawyers in this

17  room.  The trustee has got two.  My client's got

18  one.  The debtor's got one.  If you go by sheer

19  numbers, we're outnumbered.

20           THE COURT:  If you want to go by

21  numbers, you lose.  Shall we move on, or shall we

22  not go by numbers?

23           MR. NEIWIRTH:  Actually, I prefer to

24  think that virtue triumphs over allegations.

25           In short, Your Honor, we respectfully

47

1   submit that when you take a look in bankruptcy,

2   so to speak, and look through this, first of all,

3   the sale is impossible of going forward, because

4   it tries to do things with corporate law that it

5   cannot do.  It tries to override the actual

6   operating agreements of each of the multiple

7   member LLCs.

8         THE COURT:  Well, now that's a point

9   that I thought we clarified, but apparently we'll

10  come back to it, and that is I understood that

11  the trustee isn't overriding any corporate

12  laws by the sale.  The sale is selling

13  whatever interest the trustee has, leaving

14  those rights to be determined at some future time

15  and some future place.  Hopefully, in a galaxy

16  far, far away.

17       MR. NEIWIRTH:  But, Your Honor, if we

18  can take it based upon what he said, that would

19  be wonderful.  But I'm going by what the paper

20  says, and the paper says something different.

21       THE COURT:  Well, but you do understand

22  that notwithstanding what all the papers say,

23  which are in conflict, what will ultimately

24  control will be the order that's entered, and as

25  you point out, there's nothing in paper so far

48

1    about the waiver of the Lady of America claim, but

2    that it is represented on the record here, and

3    that if an order were entered, that would be

4    included in the order notwithstanding the fact

5    that so far there's no paper that says so.

6              MR. NEIWIRTH:  And while we're on Lady

7    of America for just a moment, I would be

8    interested to find out, because we haven't had

9    any opportunity once we found out what the

10   contract says, and what was said today, to find

11   out whether or not Lady of America is giving any

12   break on the franchise fees to let them pay this

13   three percent.  That would be interesting to find

14   out as well.

15             THE COURT:  Okay.  Anything else,

16   Mr. Neiwirth?

17             MR. NEIWIRTH:  I would like to reserve

18   the right to rebut further depending on what we

19   hear from --

20             THE COURT:  I'll give you all the time

21   you want.

22             MR. NEIWIRTH:  Thank you, Your Honor.

23             THE COURT:  Mr. Berlin?

24             MR. BERLIN:  Thank you, Judge.  Your

25   Honor, Howard Berlin of Berger Singerman on behalf

49

1    of Lady of America, a few observations, Judge.

2    I'm looking at the Valladares chart, the one

3    that we've just been working off of that

4    Mr. Neiwirth presented, and it seems like --

5            THE COURT:  The one you held up, I

6    believe, is the trustee's chart.

7            MR. BERLIN:  No.  This one.

8            THE COURT:  Oh, it's this one?

9            MR. BERLIN:  This one.

10            THE COURT:  The Valladares chart.  It's

11    marked "Valladares" on the top --

12            MR. BERLIN:  Right.

13            THE COURT:  -- and the trustee has signed

14    it on the top, but it's got at big arrow on the

15    bottom, yeah.

16            MR. BERLIN:  I have a bunch of comments

17    regarding Mr. Neiwirth's analysis, but the

18    easiest piece is to just go right down to the

19    bottom, because that eliminates a lot of

20    discussions.

21            If you go right down to the bottom

22    line, where it says, "Total," and you see he

23    estimates the 363 value at the 805,000 he argued

24    for that discount of the 450, and then he

25    compares it in the next column over with the

1    1,077,000, he only gets to 1,077,000 if Your

2    Honor includes the $400,000 mystery money, and

3    that money is not here today.

4           So based on Mr. Neiwirth's own chart

5    and own analysis, they're out of money.

6           Now I have some other comments I could

7    make, for example, Mr. Neiwirth -- Mr. Neiwirth

8    gives full value to the 300,000 payment to

9    Manesis, but here's an interesting fact.  The

10   debtor only had $75,000 to pay Manesis on

11   confirmation, and he was going to have to pay her

12   over the next two years.  But there's only one

13   little problem with that.  There is no, no

14   evidence in the record, and no demonstration in

15   his disclosure statement that he's even going to

16   have an income.

17          So if we're going to talk about

18   discounts, I think we have got to discount that

19   by at least a hundred to $200,000, because it

20   certainly hasn't been demonstrated how he's

21   going to pay that money.

22          And, Judge, frankly, I don't think

23   Mr. Neiwirth got the 450 payment.  The way it's

24   been explained, I believe, is that the

25   purchaser's going to be making these payments

51

 1    throughout the year, and at the end of the year,

 2    there'll be a true-up.

 3            So I don't know if it's fair to

 4    discount that by ten percent --

 5            THE COURT:  So you think five percent

 6    is a better deal?

 7            MR. BERLIN:  Some modest discount.

 8            THE COURT:  But give him the benefit of

 9    the doubt.

10            MR. BERLIN:  So, Judge, based on

11    Mr. Neiwirth's own chart, we don't even get close

12    with the debtor's plan, and that's presuming --

13    that's presuming, Judge, that the debtor's money,

14    this so-called 227 and 450, on the best day, comes

15    in -- and, Judge, here's the problem with that:  The

16    only way -- putting aside for the moment, the issues

17    that have been identified with that money, the only

18    way that money comes into this case is if Your Honor

19    confirms the debtor's plan.

20            So if Your Honor would permit, I would

21    like to make some observations about the debtor's

22    plan, because I think it impacts both the

23    viability and the credibility and the likelihood

24    that the creditors would ever see the 677.

25            THE COURT:  Before we go into that, let

52

1   me go back and recap with you your arguments on

2   the Valladares chart.

3           MR. BERLIN:  Sure.

4           THE COURT:  You're pointing out that

5   the $400,000 included on the bottom is --

6           MR. BERLIN:  Is out.

7           THE COURT:  -- the $400,000 we heard

8   about today, which is not here in a suitcase --

9           MR. BERLIN:  Correct.

10          THE COURT:  -- and they may or may not

11  ultimately arrive from Singapore or Mauritius or

12  wherever it's coming from, and then also included

13  is the 450 of Mr. Behar, which the Court already

14  said could not be included.  So that kind of

15  knocks down the value of debtor's claim.

16          MR. BERLIN:  Correct.

17          THE COURT:  Okay.  Go ahead.

18          MR. BERLIN:  So, Judge, whatever

19  amount -- the 400 aside, whatever amount is left

20  out of the 227 or, even on the best day, the 227

21  and the 450, it only comes in -- it only comes in

22  if the debtor's plan is confirmed.

23          So what is the debtor's plan?

24          The debtor represents to this Court

25  that his plan is a reorganization or a

1    rehabilitation, but if you look at the plan, as

2    my colleague, Mr. Marcushamer, has advised, the

3    debtor's plan is nothing more than a Chapter 7

4    case masquerading as a Chapter 11 case.

5             What's the debtor's plan?

6             The debtor, Mr. Valladares, is

7    proposing to keep his exempt property; he's

8    proposing to retain his homestead; he's proposing

9    to retain his rights and his tenancy by the

10    entirety properties, and he's selling everything

11    else.

12            The only thing he's in the money on in

13    this plan -- the only dog he has in his plan is a

14    request to get a discharge.

15            Now, if that's not a Chapter 7 case, I

16    don't know what is; trustee's selling all of his

17    income-producing property; he keeps his exempt

18    property, and he's asking for a discharge, and,

19    in fact, what makes it even worse -- it's kind of

20    irronic -- is he wouldn't be in this position if

21    he had just simply filed a Chapter 7 case,

22    because then it would be encumbant on the other

23    parties in the case to try and argue against the

24    discharge, but now he's put himself in a

25    position where the only way he's going to get a

54

1     discharge is if he can demonstrate cause.

2                And if we ever get there, Judge, and I

3     don't think we will, we will be happy to show

4     this Court why there's no cause for this

5     gentleman to get a discharge.

6                So that's the debtor's plan.

7                So the question is:  Why is this

8     gentleman in here so aggressively fighting for a

9     plan that he has no stake in?  Why is he fighting

10    so hard for this particular group of people to

11    buy his assets as opposed to the sale that the

12    trustee organized for a third party to buy his

13    assets?  Why should he care, unless he has

14    something behind the curtain at stake?

15               So what happened in this case, Judge?

16               Mr. Valladares filed his bankruptcy

17    case 18 months ago, and for the first nine

18    months, nothing happened.  And Your Honor finally

19    had a belly full and appointed a trustee in

20    January.  And now, all of the sudden,

21    Mr. Valladares had to contend with Mr. Mukamal

22    and his counsel.  I know Mr. Mukamal. Mr. Mukamal

23    doesn't put up with any kind of nonsense.

24               Now the debtor had to figure out:

25    Well, let me see.  I've been wasting everybody's

55

1   time for nine months.  I haven't been able to

2   propose a plan.  It's Chapter 11, and probably

3   there was a moment of reality where he said, you

4   know, I don't have any money to buy my own clubs.

5   So the trustee's saying, "Well, Mr. Valladares,

6   if you're not going to sell them, I'm going to

7   sell them."

8           So Mr. Valladares had to come up with

9   an idea to keep his clubs.  And here was the

10  idea:  If you look at the debtor's monthly

11  reports, his DIP reports, month after month after

12  month, from the beginning of this case, for the

13  first 12 months, what do you see?

14          What you see is a guy who's earning a

15  living.  He gets his distributions from the

16  clubs; he gets his salary, and it's just enough

17  to pay his expenses.  There's no accumulation

18  of wealth going on.  But Mr. Valladares

19  realizes, "That's not going to be enough to

20  keep the clubs."

21          So what does he do?

22          He comes up with a scheme.

23          And what is his scheme?

24          He says, "Oh, I have got all of these

25  members in these clubs, and I'm about to lose

56

1    these clubs."

2                So what do I do?

3                I cash out a bunch of the members.  It

4    doesn't matter that the club's going to be left

5    with a liability and have to service these

6    memberships down the road.  I don't care about

7    that.  But I can pull the money out of these

8    clubs now, and I can use that to turn around and

9    come in back the front door and buy my clubs.

10                So he pulls this money out, the

11    $300,000, and fortunately the trustee says,

12    "You're going to put that in my trust account."

13                That's why we have that money

14    preserved.

15                But he didn't stop there.  He also

16    orchestrated the $450,000 to go out of these

17    clubs and go to his family members.

18                Why?  Because he knew the $300,000

19    alone wasn't going to make it.  This estate was

20    administratively insolvent.  So he pulls out the

21    300.  He pulls out the 450.  He's taking them out

22    of these clubs.

23                We filed a lawsuit, Judge, in state

24    court.  We've alleged a fraudulent conveyance.

25    It's pretty obvious.

1           I don't know what Mr. Neiwirth has

2    difficulty seeing here.  These clubs together,

3    they have their own group of creditors.  My

4    understanding, they're owed about $4 million.

5           So Mr. Valladares is going to take a

6    distribution, and his wife and his mother are

7    going to take a distribution.  You would think,

8    because it's pretty elementary, that that money

9    should go to pay the creditors of those clubs.

10          No.  That's not what happened, Judge.

11   They took the money, and they stuck it in one

12   trust account, and stuck it in another trust

13   account, hoping they could come in the back door

14   somehow, and convince this Court that they should

15   be allowed to buy their own clubs back when they

16   didn't have a penny.

17          And now the final piece of the scheme,

18   the 227 donation.  I love that piece, Judge.

19   Mr. Stevenson -- and by the way, they even say it

20   in their disclosure statement.  They say

21   Mr. Stevenson is going to request -- I love

22   that -- is going to request a company called

23   National Financial Systems Management to make a

24   donation.  It very clearly characterizes it as a

25   donation, and they want to represent to this

58

1    Court that there's nothing behind this donation,

2    that this guy, Stevenson, is just going to donate

3    $227,000 out of the goodness of his heart to help

4    this scheme.

5            So what do we know about Mr. Stevenson

6    and his company?

7            Well, as was represented earlier, it

8    turns out that this Mr. Stevenson is a partner

9    with the debtor in a couple of clubs, and he's

10   also the owner and control party of National

11   Fitness.  And National Fitness just happens to be

12   the servicer, the money servicer.

13           Umm, could be a good gig. Let's see how

14   good it is.

15           During the period of this case alone,

16   Mr. Stevenson and his company, on the five

17   percent commission, earned $900,000 from

18   servicing just these clubs.

19           That wasn't represented.  That

20   information doesn't even appear in the debtor's

21   disclosure statement.

22           It wouldn't be bad enough -- it would

23   be bad enough if we stopped at the 900, but what

24   we found out, Judge, is that it appears that

25   Mr. Stevenson took out, not $900,000, but a

1   million four, $1,400,000 in fees just during the

2   pendency of this case.

3            So you think, Judge, that maybe, maybe,

4   maybe there is a behind the scenes agreement, you

5   think maybe Stevenson has got a financial interest in

6   seeing that this particular group of people, this

7   particular group of people retains the ownership of

8   these clubs so he can retain a very lucrative

9   contract?  I think it's obvious, its obvious, Judge,

10  and it stinks.

11           So, why is the debtor fighting so hard for

12  this group of people, Stevenson and his mother, why

13  is he fighting so hard?  Because ---

14           THE COURT:  One always fights for his

15  mother.

16           MR. BERLIN:  It's pretty obvious, Judge,

17  because there is an interest here.

18           What's not being stated is he's expecting

19  to come back in after they acquire these out of the

20  estate, work for them, get distributions for them.

21  It is a very valuable interest for him.  That's why

22  he's fighting so hard with this scheme to be the

23  winning bidder.

24           Now, can he -- can he confirm this plan?

25  Let's look at a couple of elements.

1          First of all, Judge, in order for you to

2   confirm this plan, in order for the Court to confirm

3   this plan under 1129(a)(3), the Court would have to

4   make a finding, a finding that this scheme, this plan

5   was proposed in good faith.

6          Honestly, Judge, I don't see how the Court

7   will ever find that this plan was proposed in good

8   faith.  The plan is not confirmable.

9          Number two, the debtor lumped, the debtor

10  lumped all of Lady of America's claims in a single

11  class.  They put our unsecured claim, our prospective

12  administrative claim, which we filed yesterday, and a

13  priority claim, all in the same class.  Black letter

14  law, Judge, you can't do, the plan is not

15  confirmable.

16         Number three, Lady of America, Lady of

17  America voted to reject this plan.  Lady of America

18  is in their own class.

19         As a result of the amendment in 2005 a

20  provision was added with regard to individual

21  Chapter 11 debtors, it's 1129(a)(15), and it clearly

22  says that when a creditor rejects a plan of an

23  individual debtor, the debtor has to do one of two

24  things, either he has to pay the creditor in full, so

25  if we ever get to your Honor holding a hearing on the

1   amount of Lady of America's claim, in order to get

2   confirmed, he would have to pay it in full, or he

3   would have to commit five years worth of his

4   projected disposable income.  The plan doesn't

5   provide for either.  In fact, the plan suggests that

6   Mr. Valladares may not even be working, but he

7   certainly hasn't met the requirement of 1129(a)(15),

8   the plan is not confirmable.

9          Next, since at least Lady of America's

10  class has rejected the plan, the only way the debtor

11  could get the plan confirmed is by cramdown under

12  1129(b).

13         You first have to demonstrate that all of

14  the 1129(a) requirements have been met.  They

15  haven't.  And then he would have to convince the

16  Court that he retains no interest, summarizing.

17         Well, I think, Judge, would he be able to

18  make a compelling case that this whole scheme, this

19  whole orchestration is absolutely an interest, that's

20  why he's fighting so hard for this flash money to

21  come in, to buy it for his family, so he can come in

22  the back door.  The plan is not confirmable.

23         So, to summarize, Judge, here is where we

24  are.  We have a real bidder, who has put up real

25  money, who has got roots in the community, a track

1   record of being able to perform and a proposal that

2   can net this estate in excess of $800,000.

3          In addition, we have the opportunity,

4   through the trustee, to capture the $450,000.  It is

5   absolutely the best result for creditors in this case

6   to approve this sale.

7          Thank you, Judge.

8          THE COURT:  Before you leave, on the 450 or

9   405,000, or whatever that amount is, that's payable

10  over time, and I understood it to be secured by a

11  lien?

12         MR. BERLIN:  On all the interest they're

13  purchasing, yes, that's my understanding.

14         THE COURT:  And what -- how good of

15  collateral is that?  Are we assured that it's going

16  to get paid?

17         MR. BERLIN:  Well, the debtor is prepared

18  to buy it, he says, for a million bucks.  Sounds like

19  it's pretty good collateral.

20         THE COURT:  All right.  Thank you, sir.

21         Mr. Behar.

22         MR. BERLIN:  Oh, yes, Judge, just to

23  clarify, Lady of America has agreed with the trustee

24  that in the event the 363 sale is approved, the Trump

25  group acquires the assets, we will waive our

1    unsecured claim in this case.

2              And with regard to the 450 -- yes, all

3    claims in the case, that's correct.

4              THE COURT:  All claims?

5              MR. BERLIN:  All claims, and with respect

6    to the 450, if the trustee pursues the $450,000 for

7    the benefit of the estate, we will not pursue that

8    either.

9              THE COURT:  Very well.

10             MR. ALEMANY:  Your Honor, Joaquin Alemany

11   for the purchaser.

12             I just want to clarify, Jonathan Robertson

13   is in the courtroom.  He is available to provide

14   testimony, to answer questions about issues that have

15   been raised as to affiliations, as to the background

16   of the companies and how everything came to be.  He's

17   more than happy to testify today, answer your

18   questions, answer the questions of the creditors in

19   the courtroom.

20             One point I'd like to make before we go

21   there, this is, obviously, not a reorganization of

22   the debtor.  The plan very explicitly states that

23   Mr. Valladares is not going to have an ownership

24   interest in the LLC, or of any of the companies that

25   operate the physical fitness centers.  So I have to

1   echo Mr. Berlin's comments, when he says that this is

2   a bid disguised as a plan, this is just another bid,

3   apples to apples, oranges to oranges.

4           A lot of questions have been raised about

5   TG Capital and about Mr. Jonathan Robertson.  You

6   know, a lot of questions can be raised about HMC, who

7   are they, are they represented by counsel, are they

8   submitting to the jurisdiction of the Court?

9           We know that the $450,000 in escrow is --

10  the ownership of that amount of money is

11  questionable.  That's the only amount that they're

12  proposing to pay.

13          The other amount that they're proposing to

14  pay is the future payments.  So, when we look at

15  that, they're committing to pay future payments that

16  haven't been quantified.  So, I'm not sure how we can

17  even address that issue.

18          Your Honor, you asked about the security

19  and how secure the payments are, that first lien on

20  the assets of these corporations.  TG Capital, as

21  Mr. Freedman had mentioned, has been involved in

22  numerous stalking horse situations.  They have been

23  involved in many bankruptcies.  They are -- in 10

24  years, the companies that they have purchased through

25  bankruptcy, they have not had to put them back into

1    bankruptcy.

2            Their reputation to hold on to a company,

3    like TG Capital, to put one of these companies back

4    into bankruptcy would be immeasurable.  So it's

5    almost like a guarantee that it's not going to

6    happen.

7            Additionally, your Honor, the $450,000

8    that's being funded is being funded on a per month

9    basis.  Our analysis has revealed that that money is

10   going to be able to be paid without any kind of a

11   problem, and I think Mr. Berlin addressed the issue

12   of the present value of the $450,000.

13           There was an amendment to our purchase and

14   sale agreement.  $450,000 is not going to come at the

15   end of the year, it's going to come on a monthly

16   basis.

17           But, your Honor, like I said,

18   Mr. Jonathan Robertson is here, we can put him up on

19   the stand.  He can explain the bid to the courtroom,

20   whatever pleases the Court.

21           THE COURT:  Thank you.

22           Mr. Behar.

23           MR. BEHAR:  Thank you, Judge.

24           THE COURT:  Perhaps we can start out with

25   your answering the question that was put by

1    Mr. Berlin, assuming, as he suggested, that

2    Mr. Valladares would not retain any interest in this

3    operation if the plan were confirmed, what is his

4    interest in seeing it sold to Group A, as the group

5    he's supporting, as opposed to Group B.

6        MR. BEHAR:  Judge, he's not going to retain

7    an interest under the plan.  He has an interest in

8    seeing that these gyms be turned over to persons or

9    entities that have put money up to pay creditors

10   under a plan that has been approved by the creditors.

11       THE COURT:  But isn't -- I mean, then

12   aren't you confirming the argument that this is

13   really just, in essence, a Chapter 7 for

14   Mr. Valladares?

15       MR. BEHAR:  Your Honor, no, I'm not, and if

16   I may, and I do have a presentation to make, but

17   Chapter 11 does contemplate liquidating Chapter 11

18   plans, that's not new, that's not unusual.

19       Our case, Mr. Berlin can attack the plan as

20   he chooses.  He fails to remind the Court that the

21   Class 8, general unsecured creditors, have

22   unanimously supported the plan.

23       Your Honor, if I may, when I started to

24   come up here before, you asked me a question and then

25   you heard from Ron Neiwirth.  The question you asked

1  me is how much hard money is there now?

2          Now, my understanding of the word hard

3  money is how much is sitting in a bank account in

4  cash today, and I would like to answer that question.

5          Under the bid, as I understand it, and

6  there has been no proof, just representations, there

7  is $100,000, period.  That's the hard money that the

8  bid has.  There is a lot of promises of future money

9  with the ---

10          THE COURT:  Yes, but, Mr. Behar, in an

11  auction type sale, the bids come in, according to a

12  procedure, and then there is a certain amount of time

13  to close.  If they don't close, they lose that

14  deposit money and we sell it again.

15          So there is a difference between somebody

16  that's got $100,000 up on deposit, which they can

17  lose if they don't do what they say they're going to

18  do, and someone who is somewhere out there saying

19  I've got $400,000 I might bring in to throw into the

20  pot.

21          MR. BEHAR:  Your Honor, I understand those

22  comments, but if I may finish, you'll see why I'm

23  going down this road, and if I may finish?

24          And I was answering the question that the

25  Court made to me, and that is the hard money.

1    Your Honor used the phrase hard money.  Hard money.

2    $100,000 at best by this bid.

3           What's the hard money right now under the

4    debtor's plan?  It's $677,000.  $677,000.

5           THE COURT:  How did you get ---

6           MR. BEHAR:  Now, your Honor, please, let me

7    finish.

8           THE COURT:  Okay.  I just want to see how

9    you get to that.

10          MR. BEHAR:  I get to that from the 277 held

11   by Mr. Neiwirth.

12          THE COURT:  227.

13          MR. BEHAR:  227, and the $450,000 held by

14   me.

15          Your Honor, I cannot express my agreement

16   with something that Ron Neiwirth said that is so

17   basic to our legal system.  You can throw slime all

18   you want, you can throw it at debtor's counsel all

19   you want.  You can try to make the Judge believe it,

20   but all it is is allegations that are unproven.

21          There is a gentleman in the courtroom,

22   your Honor, Angel Madaras (phonetic), he funded, with

23   a personal check, $100,000 of the 450 in my trust

24   account.  He'll testify that came from his personal

25   money.

1          No one has ever asked me.  No one has ever

2    asked me to prove where the 450 came from.  Instead

3    Robert Zarco and his big franchise firm, they file

4    lawsuits in state court, and they don't, by the way,

5    name, as far as I can tell, Health Management &

6    Consulting as a party to that lawsuit, one of the

7    funders under the plan, but they make all these

8    allegations and they stand before you, and Mr. Zarco

9    is a very eloquent speaker, much better than I will

10   ever be, but all he makes are allegations.

11         What I have is $677,000, if your Honor

12   doesn't want to include ---

13         THE COURT:  Okay.  If you've got 677, how

14   does that trump 805?

15         MR. BEHAR:  I'm going to get there,

16   your Honor.  Again, my plan has been approved.

17         Now, that's the hard money.  The hard

18   money.  Let's talk about other money.

19         Well, your Honor, the debtor has the right

20   to modify a plan before confirmation.  I made the

21   oral representation that we want to amend the plan

22   today, the gentleman, Chris Schuk, is in the

23   courtroom with a white shirt, the gentleman sitting

24   next to him is his lawyer.  They will testify, or he

25   will testify that within 24 to 48 hours he's going to

1    fund into his lawyer's trust account the $400,000.  I

2    believe he's already made a deposit into the trust

3    account, but he's new on the scene, Judge, and it's

4    patently unfair to this process, if you're going to

5    consider future, potential money that may come in

6    under this bid, that you do not consider the

7    amendment to the plan that the debtor wants to make,

8    which will be funded in 24 to 48 hours, as I've been

9    told.

10           It's not fair, your Honor, and let me tell

11   you why.  It's not fair because if you consider the

12   bid to be $800,000, whatever their numbers are,

13   that's not based on hard money.  That's the question

14   you asked me.  The creditors have voted on my plan in

15   favor.  They based it on hard money.

16           Now, let me tell you more about my plan,

17   because it's important for your analysis, Judge, and

18   it's more than just dollars and cents, and it's more

19   than just what's on the table now, what could be on

20   the table later, and we don't really know how long

21   this buyer is going to be around, and I don't know

22   anything about them, and neither do you, your Honor,

23   and it's just not fair.

24           However, under my plan, or under the

25   debtor's plan, which has been approved by the

1    unsecured creditors, as well as other creditors,

2    which I'm going to talk about now, the Manesis

3    (phonetic) claim, yes, the hard money that we put on,

4    $75,000 of it goes to her claim.  She settled with

5    the debtor, she voted on the plan in favor of the

6    plan.

7              I personally don't care if she sold her

8    claim to anybody.  That's a settlement with a ballot

9    on record.  The only one there votes in favor of the

10   plan.

11             Class 5 is Regions Bank.  They have a

12   $960,000 claim in this case.  They have voted in

13   favor of the plan, and through the plan they're being

14   treated outside of the plan.

15             What's going to happen, your Honor, if you

16   let this bid go forward?

17             Well, their main claim, their main obligor

18   are these gyms that are being purchased.  The buyer

19   is not assuming those liabilities, so they're not

20   going to pay them.

21             Then the trustee moves, or Lady of America

22   moves to convert the case to a 7 after the sale

23   happens, Regions Bank has a nine hundred something

24   dollar claim, which goes into the pot with the other

25   general unsecured creditors, diluting the possibility

1    of those other creditors getting a distribution,

2    because now you've got a serious claim that's been

3    put into the pot.  Again, Regions Bank voted in favor

4    of the plan, Class 5.

5            Class 6, Biscayne Bank, they have a

6    $757,000 claim against the debtor.  Through the plan,

7    which they voted in favor of, that claim is being

8    paid outside of the plan.  Again, it's the same

9    scenario, main obligors, all the clubs, this buyer is

10   not assuming those obligations under this offer,

11   that's going to be a huge claim.

12           So you're looking at 1.6 million or so of

13   new claims that my debtor's plan addresses and deals

14   with, and by the way, counsel for Regions Bank is

15   here in the courtroom today.

16           Lady of America says, if the bid goes

17   forward, we'll waive our claims.  Well, our plan

18   doesn't -- it's not dependent on a waiver or not of

19   their claim.  We will deal with their claim without

20   estate money.  That's what our plan says.

21           So that we all don't lose sight of what our

22   plan does, even without the modification.  Unsecured

23   creditors get a guaranteed 10 percent distribution on

24   the effective date, with a possibility of 20 percent

25   over time, and the only reason why that time period

1    would be delayed is because of the acts of Lady of

2    America, in trying to shut down the gyms.

3           Your Honor, you should consider the

4    modification of the plan.  Why so?  Because if within

5    24 to 48 hours we have that additional $400,000, as

6    has been represented ---

7           THE COURT:  You better make that 72 hours.

8    Most banks don't operate on Saturdays.

9           MR. BEHAR:  Your Honor, if you would give

10   us more time, that's fine.

11          The point that I'm making is, we will have

12   in cold currency $1,077,000.  We would modify the

13   plan to sweeten the pot.  Creditors have already

14   voted in favor the plan, your Honor.

15          Your Honor, all the other issues that

16   Mr. Berlin mentioned, I will reserve my right to

17   discuss them, when I hope that you will let this

18   debtor's plan go forward as modified, let's see if

19   the money comes up.  That's a lot of money, Judge,

20   and please do not lose sight of the fact that the

21   creditors, other than Lady of America, who is the one

22   that's been fighting my debtor for years, even before

23   the bankruptcy, everybody else that voted voted in

24   favor of the debtor's plan.

25          MR. FREEDMAN:  Your Honor ---

74

1          MR. BEHAR:  One other thing, your Honor, if

2     I may?

3          THE COURT:  Sure.

4          MR. BEHAR:  Again, going back to the money

5     that I'm holding, there is also a gentleman, Mario

6     Puerto, he's an attorney in Puerto Rico, just so your

7     Honor knows, he funded 50,000 of that money, just to

8     show you, and we'll show you where the other money

9     came from, but I want to put on the record, so when

10    the word slime, and allegations of fraud, and breach

11    of professional responsibility, and conflict of

12    interest are tossed around at the debtor and myself,

13    those are unproven and they will be shown to be

14    false, your Honor.

15         Please allow this debtor's plan to go

16    forward.  Deny the bid offer as being nothing but a

17    lot of smoke and mirrors, a lot of future promises,

18    where our plan has money on the table.

19         THE COURT:  What about 1129(a)(15)?

20         MR. BEHAR:  Your Honor, we can amend the

21    plan -- I will tell you, the interesting thing is,

22    what Lady of America has said in their papers is that

23    if our plan get confirmed, the first thing they're

24    going to do is move to enforce the restrictive

25    covenant against Alex Valladares.  He's not going to

1    be earning income for at least two years.  So that

2    projection is going to be real easy to show that on

3    his projected income for five years, of which maybe

4    three he might have gainful, real employment, it

5    ain't going to come close to $1,077,000.

6              So, the plan will be supportable under

7    1129, that section, but again, your Honor, you said

8    this was not the confirmation hearing.  We will

9    address those issues, but right now the issue that I

10   understood we were talking about was a plan versus a

11   bid.  You asked hard money.  We have it.  They don't,

12   and we have the ability to add $400,000 more on the

13   table within -- you give us 72 hours, we'll make it

14   so, Judge.

15             THE COURT:  Mr. Berlin.

16             MR. BERLIN:  Your Honor, it's my experience

17   with this Court that when your Honor enters an order,

18   it's supposed to be followed, and I appreciate all of

19   the wishes and dreams of Mr. Behar, but in

20   your Honor's sua sponte order at Page 9 you were very

21   clear, that if the proposed purchaser wishes to bid,

22   which is effectively what Mr. Behar is attempting to

23   do here, the purchaser should place a $35,000 deposit

24   with the trustee and otherwise comply with the bidder

25   requirements provided, and Mr. Behar did none of

1    that.

2              It's always nice to hear a funny argument,

3    but it's not relevant.

4              Judge, the one glaring problem with

5    Mr. Behar's presentation is his money, whatever

6    amount it is, none of it is hard.  It's all flash.

7    It's sitting in Mr. Neiwirth's account.  It's sitting

8    in Mr. Behar's account, and the plan couldn't be

9    clearer, the only way that money ever sees the light

10   of day, the only way, there is no risk, is if the

11   plan confirms, and then they have the right to decide

12   if they wish to close or not.  They have no risk if

13   they choose not to close.  It's what they call flash

14   money.  None of it is hard.

15             Now, it's always disturbing to me, Judge,

16   and I know I've been doing this for 30 years, but

17   it's always disturbing when a commercial lawyer

18   stands up here and makes a representation that's

19   patently false.

20             Mr. Behar represents to this Court that the

21   claim of Regions, and the claim of Biscayne Bank is a

22   direct obligation of the debtor.  False.  Mr. Behar

23   knows those are claims directly of the operating

24   entities.  Mr. Behar knows that when the purchaser,

25   when TG buys those entities, they become obligated

1    for those debts.

2              His client is just a guarantor.  This

3    operation would have to fail and not pay those

4    obligations before this gentleman ever had to stroke

5    a check, and why did this gentleman in his plan say

6    that he was just going to continue to guarantee,

7    because he knows they're going to continue to pay,

8    because he knew the clubs would be able to pay and

9    this way he wouldn't have any obligation.  Otherwise

10   his plan would be doubly non-confirmable because he's

11   failed to demonstrate how he has the ability to pay

12   those amounts if the clubs don't.

13             Your Honor, this couldn't be clearer, this

14   is black, and this is white.  We have a real buyer

15   with real money.  We have allusions.  We have

16   schemes.  We have promises.  We have Mr. Behar

17   literally coming up to the podium and is making it up

18   as he goes along, whatever he can do to keep his

19   client in play.

20             Your Honor was very clear, today was the

21   day of the sale.  If they wanted to be a bidder, they

22   could have complied with your Honor's order and they

23   didn't.

24             THE COURT:  Yes, sir.

25             MR. MUKAMAL:  Your Honor, this is

1    Barry Mukamal.  May I be very brief on one point?

2                THE COURT:  You may be brief on two or

3    three points.

4                MR. MUKAMAL:  Thank you, your Honor.

5                My charge is to monetize assets of the

6    estate and pay creditors the maximum amount possible

7    under the circumstances.

8                I have no objection, and I don't know if

9    this enters into the Court's feelings, I have no

10   objection to allow the $400,000 that Mr. Behar is

11   talking about to be tendered as part of his, quote,

12   bid, subject to a hard deposit being put down, and

13   that money being put up in a short period of time in

14   terms of the Court weighing which bid is better.

15               If we're eliminating from determination the

16   claims of Lady of America on the final distribution

17   to creditors from our analysis then -- and we're just

18   looking at cash being injected into this, the

19   addition of $400,000 makes a difference.  If we're

20   considering the claims as part of the consideration,

21   the waiver of the those claims is part of our

22   consideration, then that changes the analysis.

23               So that's all I wanted to say.  Thank you.

24               MR. FREEDMAN:  May I just add one point?

25               THE COURT:  Well, you're stepping in front

1    of someone who is ahead of you.

2            MR. FREEDMAN:  I'm sorry.  I just wanted to

3    follow up on something Mr. Mukamal said, and I think

4    he meant to add this, and I apologize.

5            THE COURT:  Go ahead.

6            MR. FREEDMAN:  It's a fact that, I mean,

7    Mr. Berlin was right, one of the problems that

8    Mr. Mukamal and I are facing is the fact that it's

9    not apples to apples in respect to a 363 sale.

10           TG and their group is here on a 363 sale.

11   Mr. Valladares is here on a sale wrapped into a

12   confirmation.

13           Now, if Mr. Valladares' group wants to step

14   up and say, we're willing to buy these assets,

15   separate and apart, or not conditioned upon

16   confirmation, then I think we probably have something

17   that needs to be discussed, but if TG's group is

18   ready to close today, subject to a couple of issues,

19   and the Valladares group is saying, well, we'll close

20   somewhere down the road, if, and only if our plan is

21   confirmed, then I think we have a bird in the hand

22   versus, you know, something that may be in the bush,

23   and that's the problem we're facing, and I know that

24   Mr. Mukamal wanted to deal with that issue.  So, I'm

25   adding that because of the fact that he's not present

1    in the courtroom.

2            THE COURT:  Thank you.

3            MR. PEREZ:  Your Honor, just to clarify the

4    record a little bit.

5            Mr. Behar indicated that the secured

6    creditor had accepted the plan, had voted to accept

7    the plan.

8            I offer to the Court, the ballot that was

9    actually filed by Manesis, it's a conditional

10   approval, just so the Court has a full understanding

11   of exactly what the secured party ---

12           THE COURT:  What was the condition?

13           MR. PEREZ:  It was -- the condition was

14   that they understood the Court order to be a sale

15   that -- a sale auction hearing happening first, and

16   if that resulted in a better return to the secured

17   party, then they would support the sale of the assets

18   and not the confirmation of the plan.

19           Obviously we stand here as a secured party

20   today supporting the sale process and the bid

21   offered, again, with the understanding that these

22   are, in fact, affiliated parties, now that ---

23           COURT REPORTER:  I'm sorry ---

24           MR. PEREZ:  Affiliated parties, and I

25   wanted to address two other issues, one that was

1    raised by Mr. Berlin, which is this unsecured -- the

2    comments made by Mr. Behar with regards to the -- to

3    what happens after the fact, and the increase in the

4    unsecured creditor pool if we do not -- if somehow

5    these two entities that are purchasers do not

6    perform.

7           We're both exactly in the same situation

8    with regard to that matter.  Who is performing on

9    their side of the equation is Health Management &

10   Consulting.  We don't know who they are.  We don't

11   know how they will perform.  We don't know whether

12   they will perform.

13          And I would imagine that Regions Bank would

14   get up here and say, you know, it depends -- whether

15   or not they perform or not depends on their ability

16   and their capability to do so, but we proffer and,

17   again, Mr. Robertson is here, that TG -- that these

18   two entities, backed by TG Capital, are more than

19   willing and able to perform and, in fact, will

20   perform and will abide by what they're buying, and

21   what they're buying is going to be -- those entities

22   will, in fact, be subject to the rights of Regions

23   Bank, and in the absence of Regions Bank, if we don't

24   perform, that equipment will be foreclosed on,

25   et cetera, but we're exactly in the same position,

1    and ultimately what I want to focus the Court on is

2    not the numerator, it's not what the money is, but

3    rather the denominator, your Honor.

4             Really, to fully understand this, we

5    believe that we have more cash up front, but to fully

6    understand the impact, you have to look at the

7    denominator, you have to look at how much the claim

8    pool is, if you accept the plan or you go with us,

9    and their ability to perform, both of them, and we

10   think that there is no doubt that the denominator

11   here, the amount of the unsecured creditor pool will

12   be substantially less with our bid, and so to focus

13   on how much money is upfront, although we do believe

14   we will provide more upfront, our plan does

15   provide -- or our bid provides more upfront, we would

16   respectfully ask the Court to focus on the

17   denominator, focus on what that money will be divided

18   into, and if you focus on that, I think it all

19   becomes very, very clear, whether the 450 is in,

20   whether the 450 is out, whatever it is you want to do

21   with that, but this -- but our bid, the bid of our

22   client is better, because the denominator is better.

23            Thank you.

24            THE COURT:  Thank you.

25            MR. BEHAR:  Your Honor, just two quick

1    comments.

2              Number one is ---

3              THE COURT:  Make them slow comments.

4              MR. BEHAR:  The Manesis claim is settled,

5    we have writings, and we'll get to that point if need

6    be.

7              The other issue, something kind of dawned

8    on us in the back of the courtroom, something

9    Gary Freedman said to us in the back, maybe we need a

10   postponement, Judge, because maybe there is a

11   different way to approach the debtor's position.

12             We do believe the plan is better, but if

13   what we're fighting over is a sale of an asset, maybe

14   there is a different way to approach it, and it

15   accomplishes the trustee's goal of selling what's in

16   the estate, and then the debtor's goal of trying to

17   confirm a plan, and we would request, your Honor, a

18   postponement of this hearing, the parties aren't

19   going anywhere, and give us a chance, because we do

20   have more money on the table, and if we change it to

21   some kind of a bid, it's clearly more money.

22             THE COURT:  Yes, sir.

23             MR. PEREZ:  With all due respect,

24   your Honor, we followed the rules.  Your order was

25   very clear as to what was to happen, and with all due

1    respect to Mr. Mukamal, we followed the rules.  We're

2    here at as a good faith purchaser, who put up their

3    money, who did exactly what your order indicated, and

4    we're here to finish this process today and, you

5    know, we have faith that this Court will proceed

6    based on the rules that it set, the rules of the game

7    that it set and, you know, we will certainly abide by

8    this Court's ruling, but certainly our expectation is

9    the Court will continue to follow the rules that it

10   set.

11          MR. FREEDMAN:  Your Honor, just to be

12   clear.  I said to Mr. Behar exactly what I just said

13   to the Court, that we need to be dealing with apples

14   and apples, and you need to divest yourself of the

15   concept that this has to be tied to confirmation.

16          I believe that if they have something to

17   present today, whoever is in the courtroom, willing

18   to put up hard money today, needs to get up and say

19   that.  I do believe that that was the purpose of

20   being here today, and although the Court's order, and

21   I just want to remind the Court, because other

22   parties brought this up on Tuesday, that Page 2 of

23   the order does say the order is subject to

24   modification by the Court for cause at any time prior

25   to the sale, but the parties had notice, and so, you

1  know, if the Court believes in good faith somebody

2  else has hard money up, and there is a reason to

3  continue this, well, perhaps that may be something to

4  consider, but I haven't heard anything yet to warrant

5  that.

6          THE COURT:  Thank you.

7          MR. BERLIN:  Judge, before Mr. Neiwirth

8  gets to the podium, I'm going to enter an objection

9  to Mr. Neiwirth's participation in this proceeding.

10          Mr. Neiwirth has taken great license with

11  the Court this morning.  He represents a prospective

12  buyer.  Prospective buyers are not parties in

13  interest.  They do not have standing to argue the

14  merits of the case.  It's well settled law in the

15  11th Circuit.

16          Mr. Neiwirth's only interest in this matter

17  is to represent the client who he claims has a

18  partial interest in some of the assets, that issue,

19  as to who is getting and who is selling what has

20  already been disposed of.  All of the other arguments

21  that Mr. Neiwirth is making go far beyond his rights,

22  and he has no standing no this matter.

23          THE COURT:  I would agree with you,

24  Mr. Berlin, but Mr. Neiwirth is also a skilled, wise,

25  talented bankruptcy practitioner, and notwithstanding

1    the fact that he may not have standing to make

2    presentations on behalf of his client, the Court is

3    always happy to hear from him as a friend of the

4    Court, and to allow him to share his wisdom with us.

5    It might be helpful to everyone.

6              Mr. Neiwirth.

7              MR. NEIWIRTH:  Not to mention, your Honor,

8    I've got 38 years into Mr. Berlin's 30, that he

9    remarked on before.

10             MR. BERLIN:  His hair is greyer.

11             MR. NEIWIRTH:  I earned it listening to

12   you.

13             May it please the Court, picking up on what

14   Mr. Berlin said before, and also picking up on what

15   Mr. Behar said, there is some measure of fundamental

16   fairness here, your Honor.  The sale order does

17   provide that things can be altered, but also we've

18   seen the bid and the background of the bid change as

19   we sat here today.

20             They walked in here today and they said,

21   oh, we sweetened the earn out payments, instead of

22   making them due 15 months from now, we'll pay monthly

23   as we go, and they changed things.

24             They also changed the fact that today they

25   walked in and said, oh, nobody said it before but,

1    LOA will waive claims, they changed the bid.

2             By the same token, the debtor in the format

3    of its plan, rather than in the format of the 363

4    sale, responded and came up with a better offer in

5    the plan.

6             It seems that what's good for the goose, in

7    terms of being able to change things on D-day, right

8    before the Court as we speak, should be equally

9    applicable to the gander, so to speak.

10            Essentially if they have the new party with

11   its counsel in the Court prepared to tell the Court

12   what he wants to do about 400,000 additional dollar,

13   the trustee, in his business judgment, is not adverse

14   to hearing about more money into the estate, and we

15   respectfully submit, as a matter of fairness, if one

16   side gets to sweeten the pot, the other side should

17   as well, and your Honor was certainly more graceful

18   about it than I may be.

19            I represent interested parties in several

20   different capacities in this case, but the one I do

21   not represent is anybody that's a buyer.  My clients

22   have absolutely nothing to do with the purchase of

23   the clubs by the third parties.

24            THE COURT:  You missed on that one.  You

25   were making a good point, but now you raised the

1    question of why he's throwing in $227,000.

2           MR. NEIWIRTH:  Because they own -- two

3    things, number one, they own a half interest in one,

4    and it makes money, and they don't want to see it go

5    down the drain into strange hands and have a partner

6    they've never heard of.

7           The other one, your Honor, is that, as

8    Mr. Berlin chose to excoriate my client for, they are

9    the financial processor for not only these clubs, but

10   a whole bunch of other clubs, literally hundreds of

11   them, and this is a customer, and they don't want to

12   see the customer either go bad, or close, or lose in

13   another respect, so they have a financial interest in

14   keeping this outfit alive, which really has nothing

15   to do with purchasing it.

16          I just wanted to make that clear, because

17   we're not a purchaser, we're not intending to be a

18   purchaser, but we're certainly an interested party in

19   the outcome, interested sufficiently to put up money

20   to help it.

21          THE COURT:  Thank you.

22          MR. NEIWIRTH:  Thank you, your Honor.

23          MR. FREEDMAN:  Judge, just one point, if I

24   may?

25          THE COURT:  You keep saying one point, and

1    this is another point.

2            MR. FREEDMAN:  Yes, one other point.

3            Perhaps Mr. Neiwirth didn't understand my

4    comments, and the trustee's comments.

5            With respect to the TG offer and the

6    sweetening of the pot, as he indicated, I mean,

7    that's up, they've agreed to do that today.

8            What the Valladares group hasn't done yet

9    today is come up and say, this is our offer, and

10   that's the difference, and that's what I'm still

11   waiting to hear, and if we don't hear it, then I

12   think we're pretty much done.

13           MR. BERLIN:  Judge, again, Mr. Neiwirth, I

14   guess, wasn't listening the entire time.  The TG

15   group is a qualified bidder.  They followed the

16   rules.  They're here at the auction.  They can

17   improve their bid.

18           The other group never qualified.

19   Your Honor's order is extremely clear and, you know,

20   it's nice to hear Mr. Neiwirth describe what his

21   client is all about, but the debtor had three -- two

22   or three shots with a disclosure statement, and it

23   never occurred to him to disclose the side deal

24   between him and Mr. Stevenson, it never occurred to

25   him.

1          MR. ZARCO:  Your Honor, one point, one time

2    up, Robert Zarco.

3          I think the Court needs to understand

4    something, and I think actually these ---

5          THE COURT:  The Court needs to understand a

6    great deal.

7          (Laughter.)

8          MR. ZARCO:  Right, but I actually think

9    that the bidders that are throwing all this money

10   that they plan to throw into this case, need to

11   understand what they're throwing money into, you

12   know, with regard to the Valladares side, because

13   your Honor very specifically, and I touched upon this

14   the other day before the Court, and I remember the

15   Court said, and has said very specifically, that

16   whoever is buying whatever they're buying today has

17   to understand that they're only buying whatever

18   interest may exist, and the reality is I spoke

19   generally the other day, but I'm going to be a little

20   more specific, because I think it's going to help you

21   a little more, and perhaps help the bidders a little

22   more.

23          Very specifically, Section 6.7 of the

24   franchise agreements specifically say that the

25   franchisee acknowledges that all of the memberships

1    sold by Systems Centers are the sole property of the

2    franchisor and will be on consecutively numbered

3    membership agreements.

4              The franchisee, now this is very

5    interesting, the franchisee is entitled to all

6    monthly proceeds from the membership agreement as

7    collected for each month that the franchisee provides

8    System members, Systems, with a capital S, as

9    defined, with services as prescribed within the

10   manual and the franchisee center is not in default.

11             Now there is two conditions here.  First of

12   all, the franchisee can only collect the money from

13   the members if the franchisee is a franchisee.

14             Now, it's undisputed, as you've heard from

15   Lady of America's position, as well as the position

16   from the debtor, it's undisputed these franchise

17   agreements are terminated.  Because they're

18   terminated he's no longer a franchisee.

19             Because these members can only pay revenues

20   as a part of a system, these are System members,

21   these members are no longer part of a System.  The

22   only way this debtor would ever be entitled to

23   collect the revenues from these members is if they

24   are System members.  They are not.

25             The second condition is that the franchisee

1    is not in default.  Here we've gone way beyond

2    default.  We're in termination stage.

3            That then triggers Section 8.2 of the

4    agreement, which is the proprietary information.

5    These franchise relationships, Judge, are riddled

6    with all kinds of proprietary and confidential

7    information with regard to how it is that these

8    Systems are to be operated.

9            It is very important for the franchisor, in

10   fact, he has a legal obligation ---

11           THE COURT:  Slow down, Counselor.  The

12   reporter is trying to get every word.

13           MR. ZARCO:  I'm sorry.

14           In fact, the franchisor has a legal

15   obligation to protect all of the trademark, copy

16   rights and proprietary and confidential information

17   from use by people who are no longer franchisees.

18           If the franchisor fails to take action to

19   protect that proprietary and confidential

20   information, what then happens is that this

21   franchisor is liable, and subject to lawsuits from

22   other franchisees who are members of the System, who

23   are franchisees within the System, and as a result

24   under Section 8.2 there is -- under 8. -- I'm sorry,

25   under 8.3-B, it discusses their non-compete, very

1  important as to the breath and scope of the

2  non-compete, in terms of who it applies to.

3        It says that in addition, it talks with

4  regard to the fact that the franchisee in 8.2-A --

5  8.3-A cannot disclose proprietary and confidential

6  information, but under 8.3-B it says, in addition for

7  two years after the expiration or termination of this

8  agreement, or the permitted transfer of the

9  franchise, the franchisee and its, in capital

10  letters, associated persons will not have a direct or

11  indirect interest as an officer, director, partner,

12  investor, shareholder, employee, agent or otherwise

13  in any business that engages in the same line of

14  commerce as the franchise business.

15        It is very clear here that what they're

16  seeking to do is to run this business outside of the

17  franchise system, but what is the definition of an

18  associated person?

19        An associated person is not only

20  Mr. Valladares, so when Mr. Behar gets up and here

21  says Mr. Valladares is not going to work for two

22  years so, therefore, Judge, disregard this notion of

23  even the restrictive covenant having any impact.

24  It's these other people, you have to look at what is

25  the definition of an associated person that is

1    governed by this agreement, and it specifically says

2    the franchisee, Mr. Valladares, or anybody else that

3    signed as a franchisee, and I tender to the Court

4    that Mr. Valladares' mother also has signed as a

5    franchisee on at least one other franchise agreement,

6    and she'd been determined, so she clearly falls

7    within the restrictive covenant.

8              Let me continue.

9              The franchisee, his or her successor and

10   assigns, all persons signing with or for the

11   franchise, its managers, officers, directors,

12   shareholders, remember we have heard lot about,

13   Judge, look at all these entities, Mr. Hoyt

14   (phonetic) owns 50 percent, and Mr. Madaras owns

15   50 percent, and the mother owns 30 percent.  Well,

16   all these are admissions by them that they are

17   associated persons.  Then it continues, it says

18   officers, directors, shareholders, partners, limited

19   partners, holders of a 5 percent or greater

20   beneficial interest in the franchisee and those of

21   his or her employees and agents who have access to

22   any proprietary information.

23             That's the whole purpose, we need to

24   protect the proprietary and confidential information.

25   All these people are collectively defined as

1    associated persons having a confidential relationship

2    with the franchisor.

3           Judge, I don't understand how I'm sitting

4    here and listening to all of this, we're going to do

5    this, we're going to do that, and they can't.  They

6    cannot, and at the very beginning you said, I've got

7    to make sure everybody is very clear, they only are

8    buying, and they're bidding on whatever rights they

9    may have.

10          Well, Judge, I'm telling you they have no

11   rights because they cannot operate.

12          THE COURT:  Well, don't tell me.  Tell

13   them.

14          MR. ZARCO:  Well, no, I'm doing them a

15   favor here, Judge.  I'm telling you people are

16   throwing out 400,000, $200,000, and they have no idea

17   that they're going to lose this money, because

18   they're not buying anything, because only this

19   company here controls this money.  This company is

20   controlling the revenue, and for them to talk about

21   how Regions Bank, and this bank is going to get the

22   money from the operation, there is no operation,

23   there is no source of revenue because the members

24   belong to them.  It's undisputed, it's in the

25   contract, and they can't operate a competing business

1    because the non-complete applies to every one of the

2    people who formed part of the group that's bidding,

3    and Hoyt Stevenson, and I'll show you, Judge, from

4    the schedules, I don't have the schedules here, I

5    don't know what these schedules are called?  What's

6    these called?  Oh, the amended disclosure statement

7    specifically says that Advance Fitness Consulting,

8    Inc., one of these corporations, Angel Madaras is a

9    50 percent shareholder, clearly by definition an

10   associated person.

11          You look at West Flager Consulting

12   Services, Mirna Valladares is 33 percent, and Berta

13   Aedo, 32 percent, associated person.  Hoyt Stevenson,

14   Hoyt Stevenson is listed here, 30 percent owner in

15   Fitness Clubs of America.  NFSM, 20 percent, clearly

16   associated persons.  Mirna Valladares, Dorato Fitness

17   Management, Inc., 50 percent.

18          These people all have access and have had

19   access to all this proprietary information, because

20   as Mr. Berlin said, Judge, the reality is -- and I

21   know the word slime has been thrown around here, and

22   I'm not fond of using those words in Court, but you

23   know what, if the shoe fits, the reality, Judge, is

24   that the $450,000 that I know you're not really

25   considering, because you really can't consider it,

1   because that money is so tainted, Judge, that that

2   money comes from our members, those members which we,

3   the franchisor, is going to have to service for the

4   next three years because they cashed out money that

5   does not belong to them to come to the Court here and

6   offer it to you so they can buy it back.  It's the

7   most ridiculous set of facts I've ever heard.

8           But I understand your Honor wants to be

9   cautious, so you're giving them the benefit of the

10  doubt, but even if, in their best day, the 450

11  becomes theirs, their bid is still lower, but I'm

12  telling you, Judge, there is never even going to be a

13  best day.  It's not even remotely possible, and with

14  regard to Mr. Hoyt Stevenson's $227,000, he is

15  looking to donate, I love the word, I read it three

16  times, I couldn't believe, it had to be a giant typo,

17  donate $227,000, because he is fighting over an

18  alleged 50 percent interest in clubs which have been

19  transferred without authority in violation of various

20  provisions here.  Section 9.5 of the franchise

21  agreement specifically says, these are all automatic

22  terminations of the franchise agreements, when you

23  transfer clubs without the authority of the

24  franchisor.

25          I mean, I think there is a lot of people

1    that the debtor is putting forth to bid that have no

2    clue how they are going to be donated money to air,

3    because that's all they're going to get, because

4    that's all this debtor has the right to get, because

5    they cannot operate any of these clubs under any

6    circumstances if this Court is going to uphold the

7    language of validly binding franchise agreements.

8           You have unauthorized transfers, you have

9    taking of money that doesn't belong to them, you have

10   members -- Judge, do you know where this $227,000

11   came from?  It came from the fact that Fitness

12   Company, the one that Hoyt Stevenson controls, has a

13   five percent processing fee, but those franchisees,

14   these companies' franchisees have been overcharged,

15   way beyond the five percent, because you know what

16   happens, you know how this works, every month on your

17   credit card you get a 29 or $39 charge, some people

18   don't even look at it, and there is all kinds of

19   allegations of double billing, and over billing,

20   because people don't even notice, and you know what

21   the rule is, we'll over bill, we'll charge $39, we'll

22   charge 12 percent.  If they catch it, we'll give it

23   back to them, but you know how many people are

24   catching it?  Very few.

25           So, Judge, I'm telling you it's almost

1    better that you don't know all the details, because

2    it will clog your mind, okay, and everybody else's

3    here, but I justed want to make sure ---

4              THE COURT:  What do you mean, will clog my

5    mind?  It's already clogged.

6              (Laughter.)

7              MR. ZARCO:  I just want to make sure we all

8    understand, all these bidders are associated persons.

9    They cannot operate these clubs, and there is no

10   ability for them to have any revenue at all that can

11   in the future contribute any value to this estate.

12             THE COURT:  Thank you.

13             Mr. Behar, before we hear from you, I

14   notice the United States Trustee has been patiently

15   observing and contemplating these proceedings.  I

16   wonder if she has any thoughts?

17             MS. ARMENGOL:  Judge, the more we talk, the

18   worse things get.  So ---

19             THE COURT:  I think that's probably the

20   most incisive statement made this morning.

21             MS. ARMENGOL:  Your Honor, just as

22   Mr. Mukamal expressed to this Court, we cannot turn

23   around and disregard the $400,000 in additional

24   monies that have been offered, if that's going to

25   benefit the creditors.

1          However, Judge, I echo Mr. Freedman's

2    concern that that money has to be put up today,

3    because we are walking away from a sale that may not

4    be there tomorrow, an offer that may not be there

5    tomorrow.

6          THE COURT:  You haven't started walking

7    yet.

8          MS. ARMENGOL:  So, those are the only

9    comments I have, your Honor.

10          Let's consider the $400,000 in additional

11    monies, let's see it today.

12          THE COURT:  Very insightful.

13          Okay.  Anyone that hasn't been heard that

14    wants to be heard?

15          MR. BIANCO:  Good morning, your Honor.

16    John Bianco of Tripp Scott on behalf of Regions Bank.

17    Just a couple of thoughts, your Honor.

18          I received the asset and purchase agreement

19    just last night.  Attached to it was a proposed

20    order.  I know we may not get there today, but just

21    in case I wanted to put it on the record, the bank's

22    concern is that none of their in rem or in personam

23    rights against the entities that are allegedly going

24    to be sold are going to be impacted by the sale

25    today.

1          THE COURT:  Well, no entities are being

2     sold.  Only the rights of Mr. Valladares is being

3     sold.

4          MR. BIANCO:  Well, but the problem is,

5     your Honor, the order, the proposed order that I saw

6     was extremely broad, it talks about mortgage rights

7     and lien rights being satisfied of record, it talks

8     about being forever barred and enjoined from pursuing

9     any claims, and I don't think it was meant to go that

10    far.

11          I spoke with Mr. Perez this morning, and he

12    has assured me, but I just wanted to make sure that

13    was on the record, your Honor.

14          The other thing I would simply say is

15    Regions did vote for the plan.  The basis was our

16    loan has always been current.  With respect to

17    Mr. Valladares, he is simply a guarantor, and we

18    didn't discover this particular purchase agreement

19    until last night.  My client isn't even aware of the

20    existence of the agreement or who the parties are.  I

21    do know that Mr. Perez gave me some background and

22    assured me about their viability and credibility, but

23    as I sit here today, my client has no idea this is

24    even happening, and who the parties are.

25          Thank you.

1          THE COURT:  All right.  Are we all

2     finished?  We're going to take a brief recess.

3          Do you want to stay on the line or do you

4     want us to call you back, Mr. Mukamal?

5          MR. MUKAMAL:  I'll stay on the line,

6     your Honor.

7          THE COURT:  Very well.  I just want to look

8     up a couple of things in Chambers and we'll be back

9     in somewhere between five and ten minutes.

10          (Thereupon, a recess was had, after which

11       the following proceedings were had:)

12          THE COURT:  Are you still there,

13     Mr. Mukamal?

14          MR. MUKAMAL:  I am, your Honor.  Thank you.

15          THE COURT:  All right.  A few folks stepped

16     out, and they're coming back in the room now, and

17     we'll be ready to wind up this matter in the next

18     couple of minutes.

19          MR. BEHAR:  Actually, your Honor, if I may,

20     can I ask for an additional five minutes?  We're

21     finishing up some discussions which will have a

22     significant impact on this hearing.

23          Mr. Freedman and Mr. Mukamal were part of

24     the discussions.  I just need five more minutes to

25     finish something up and then we'll come back in.

```
 1              THE COURT:  Well, I think you're wasting
 2   your time and mine, but -- I think I'm ready to rule,
 3   and I don't know what you plan to do that will change
 4   my ruling, but if you need five more minutes --
 5              MR. BEHAR:  Please, Judge.
 6              THE COURT:  -- it's now 12:41 -- pardon
 7   me 12:42, so we'll be back in at 12 -- five and two
 8   are.
 9              UNIDENTIFIED:  Seven.
10              THE COURT:  Oh, thank you, seven.
11              (Thereupon, a recess was had, after which
12         the following proceedings were had:)
13              THE COURT:  Yes, sir.
14              MR. BEHAR:  Your Honor, thank you for your
15   indulgence in us trying to work out some issues out
16   in the hallway.
17              I stand here, your Honor, I've been given
18   authorization from a bunch of various parties,
19   including SCLG Investments, LLC, including Chris
20   Schuk, who is in the courtroom, I've been given
21   authority by National Fitness Financial Management,
22   who is here in Court through Bailey Hall, as well as
23   counsel, I've been given authority by representatives
24   of Health Management Consultants, Mirna Valladares
25   and Berta Aedo are in the courtroom.
```

1          We are prepared, your Honor, to offer a bid

2    to the trustee.  The bid will be for the estate's

3    assets.  We will not, however, be purchasing the

4    franchise agreements, we will not be purchasing the

5    franchise rights.  We will, however, be purchasing

6    any avoidance actions that the trustee has or thinks

7    that the estate has.  We will close within 10 days,

8    and the purchase price is $1,077,000.

9          Oh, I'm sorry, and the $100,000 hard cash,

10   if we don't close by the closing date, that money is

11   lost to the estate.

12          THE COURT:  Very well.

13          MR. BEHAR:  I believe that money will be

14   coming from, and we will need an order, your Honor,

15   because of all these allegations, I believe it's

16   coming from the 227 that's being held by

17   Ron Neiwirth.

18          THE COURT:  The 227 makes a million?

19          MR. BEHAR:  No, we're talking about the

20   $100,000.

21          THE COURT:  Oh, the $100,000, but where is

22   the rest of it coming from?

23          MR. BEHAR:  The rest of it is coming from

24   the 450 that my office is holding.

25          THE COURT:  Can't use it, but anyhow, go

1    ahead, what else?

2            MR. BEHAR:  Can't use it.  Well, it was

3    also going to come from the 400,000 that Mr. Schuk

4    has or will represent to the Court can be funded

5    within, I believe, three days.

6            THE COURT:  Okay.  Anything else?

7            MR. BEHAR:  Your Honor --

8            THE COURT:  That money is in dispute.  Your

9    people say they put it up and Lady of America says it

10   funded out of, it belongs to them, and until it's

11   determined who owns that money, where it goes, we

12   can't be spending it, but in any event, anything else

13   you have to add before I tell you what we are going

14   to do here today?

15           MR. BEHAR:  Well, your Honor, I did want to

16   say that Angel Cabrera is in Court.  He funded

17   100,000 of it.

18           THE COURT:  Well, maybe there is 350 there

19   -- I mean, maybe there is a hundred, and some day

20   somebody else, you said, put in 50, maybe there is

21   300,000 there that can, and 150 that can, but we

22   don't know that, that's an unclear amount, but in any

23   event when you're finished I'll tell you where we're

24   going.

25

106

1           MR. BEHAR:  We are finished.

2           THE COURT:  Okay.  The Court has tried

3    to be as patient as possible and to hear all

4    sides of this issue.  Unfortunately, from the

5    point of view of the debtor, the debtor has a lot

6    of trouble passing the smell test.

7           I don't think the debtor can pass the

8    smell test.  I don't think the debtor can

9    probably confirm a plan with 1129(3) with a good

10   faith issue to be resolved.  But, nevertheless,

11   the plan is not on the table any longer as far as

12   the Court is concerned.

13          The Court entered an order for a 363(c)

14   sale today, and the rules of the sale were set,

15   and we have a qualified bidder here who has made

16   a bid which, as I understand it, appears to come

17   in, if we, using the benefit of the doubt of the

18   biggest discount of the deferred payment from

19   $850,000 to $805,000, so that's what's on the

20   table as a bid.

21          There was a concern made that the

22   bidder had improved its bid here today, and

23   that's okay.  Under the terms of a sale, you can

24   always increase your bid.  That's not a detriment

25   of anyone.

107

1          If it was a question of reduction of

2    bid or doing something that negatively impacts

3    persons, that would be a different matter.

4          So the plan is a, no.  The sale is a,

5    yes.

6          The debtor, apparently, has tried to do

7    an end run around the sale by coming up with this

8    $400,000, and, until just a moment ago, it was

9    $400,000, I thought, was in the plan, the

10   $400,000 that was announced this morning, but now

11   apparently it's being offered as a bid.  However,

12   the debtor didn't qualify as a bidder, which the

13   debtor could have done and, therefore, the debtor

14   isn't eligible to come in and start bidding

15   today, and so there being no other bidders, it

16   would appear that the sale will be closed for the

17   805 -- I should say, the sale will be approved in

18   the amount of the $850,000, reduced to present

19   market value for calculations purposes of 805 by

20   the proposed bidder.

21          Now, that doesn't mean that the debtor

22   or anyone else could not come in and move to

23   reconsider on the basis of a higher and better

24   offer.

25          As I understand the law, the -- if the

108

1    sale is deemed -- in some cases deemed inadequate

2    as to bid, if a higher and better offer is made

3    on a motion to reconsideration in an amount ten

4      percent more than the bid amount.  Now the bid

5      amount is -- we're using 805, and so the

6      available money, the 227 is there.  And so, if

7      you take the 227 and the 400, you've got 627.

8      And it would appear that that would not top the

9      present bid.  On the other hand, a bid,

10     something, I guess, in the amount of -- well,

11     whatever it takes to exceed $805,000 by ten

12     percent, might result in the Court vacating the

13     order of sale and authorizing the sale for the --

14     it would be about $880,000 or something like

15     that.

16              However, such a motion would not be

17     considered meritorious unless the full amount of

18     the offer were tendered as being in escrow or

19     immediately available at the time of the sale,

20     and it would also require, in fairness, that the

21     original bidder be given an opportunity to top

22     that bid, if they wish to raise their bid.  But,

23     basically, I don't suspect that there will be

24     such a motion to reconsider, and as I pointed out

25     on the 450, that money is disputed as to who has


109

1      control over it.  Maybe some of it might be

2      available for use on a bid, but the debtor is

3      being given an additional leniency in

4      consideration on being told that they might come

5      in with a motion to reconsider, if they actually

6      have cash on the table in an amount larger than

7     the amount that's bid.

8           Otherwise, I will ask Mr. Berlin to

9     prepare an order.  The order will indicate that

10    the Court has serious concerns about the debtor's

11    ability to pass the smell test in confirming a

12    plan that the Court, under the circumstances here

13    today, has determined that the $850,000 bid

14    reduced to $805,000 in value is the highest and

15    best bid on the sale order today, and, therefore,

16    the plan will not be considered and that the

17    matter will go forward.

18           MR. BERLIN:  Thank you, Your Honor.

19           THE COURT:  Yes?

20           MR. MUKAMAL:  This is Barry Mukamal.

21           THE COURT:  Yes, sir.

22           MR. MUKAMAL:  I'd just like to point

23    out that the 450 that you referenced, my belief

24    and information that I do have, that 300 is in

25    dispute; 150 did not come from sources that I


110

1     could identify within the debtor's control.

2           THE COURT:  As I say, so then, if you

3     add 150 you still don't seem to get there, but --

4     if that 150 is additionally available.  But the

5     point is, at this point, that 450 fund has been

6     in dispute.  The parties could have tried to work

7     it out beforehand as to the availability of it,

8     but it was not done, and now it's too late.

9           MR. FREEDMAN:  Two points, Your Honor.

10    I want to reconfirm the fact that the sale order

11    is conditional upon the resolution of the motion

12    to vacate in the adversary, because there's still

13    an issue with respect to the ownership interest

14    in those 12 entities, unless the purchaser wants

15    to correct me on that.  And then the only other

16    point I wanted to raise, Your Honor, is I think

17    the Court's heard plenty already, but if the

18    Court would require a proffer so that all the

19    elements necessary to determine that this

20    purchase is a good faith purchaser, and there's

21    no collusion, and the 363(m) and (n)

22    determination can be made --

23              THE COURT:  They may be included in the

24    order.

25              MR. FREEDMAN:  Yes, Your Honor, I was


111


1    just informed by Mr. Alemany that the purchasers

2    are willing to close notwithstanding the dispute

3    over those 12 entities.  So maybe he could

4    confirm that on the record and --

5              THE COURT:  Is that a correct

6    statement?

7              MR. ALEMANY:  That's correct, Your

8    Honor.  We're ready to close, and we don't have

9    to wait for a ruling --

10              THE COURT:  Very well.

11              MR. ALEMANY:  -- on the motion to

12    vacate.

13          THE COURT:  Okay.  Counsel?

14          MR. SCHATZMAN:  And just a point of

15  clarification, Your Honor, that earlier you did

16  rule that the stay would be in effect with

17  respect to execution on the default final

18  judgment.

19          THE COURT:  Yes, sir.  Mr. Schatzman,

20  you may submit an order that -- well, denying the

21  request to stop the auction, which you just saw

22  be concluded, and granting a stay of execution on

23  that order pending the determination of that

24  issue.

25          MR. SCHATZMAN:  Thank you, Your Honor.


112

1           MR. BEHAR:  Your Honor --

2           THE COURT:  Yes, sir?

3           MR. BEHAR:  -- two points.  Brian

4  Behar.  Two points.  One is, so the record is

5  clear, the offer that I made was not in the name

6  of the debtor.  I think Your Honor said it was.

7  It wasn't.

8              And the other point is --

9           THE COURT:  Well, whoever's name it

10  was --

11          MR. BEHAR:  That's fine.

12          THE COURT:  -- you can't walk into a

13  sale that's been on record for months or weeks or

14  whatever the time has been with certain rules and

15  suddenly come in and want to be a bidder after

16   the sale is essentially over --

17          MR. BEHAR:  I just want to --

18          THE COURT:  -- too little, too late, or

19   a day short -- a day late, a dollar short, or I

20   think it was Kipling in certain maxims of have

21   faith that said, take the cash, and let the

22   credit go, and listen to the beat of a distance

23   drum.

24          MR. BEHAR:  Your Honor, one other

25   point.  In light of your invitation to file a


113


 1   motion for reconsideration upon certain

 2   conditions --

 3          THE COURT:  It wasn't an invitation.

 4   It was a suggestion that may be a route that's

 5   available, if there's a real bona fide offer that

 6   would bring in substantially more money for the

 7   creditors than the offer that's on the table, but

 8   there's law on that, and you can follow it.  The

 9   fact that the motion is made doesn't mean it will

10   be granted.

11          MR. BEHAR:  That's understood, Judge,

12   but the point that I want to ask you is that the

13   order on the sale not waive the ten-day stay

14   period of the sale so that any party that wants

15   to come up with this money is not going to be

16   shortcut like --

17          THE COURT:  Well, there's no request to

18   waive it that I'm aware of.

19          MR. NEIWIRTH:  It's built into the

20  proposed order that's attached to the motion,

21  Your Honor.

22          THE COURT:  Well, I haven't seen that

23  order -- well, and, basically, it is not part of

24  the order that I announced on the record.  I

25  didn't waive that.


114

1          Okay.  What else?  Sorry to have

2  delayed your lunch.  Good luck, and thank you

3  all.

4          MR. BERLIN:  Thank you, Your Honor.

5          (Thereupon, the hearing was concluded

6  at 1:00 p.m.)

7                  *  *  *  *  *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


115


1                          CERTIFICATE

2

3

4    STATE OF FLORIDA )
                      SS.
5    COUNTY OF DADE   )

6

7

8

9

10

11          I, LISA E. BROWN, Professional Reporter,

12    do hereby certify that I was authorized and did

13    transcribe in Shorthand, the proceedings had and

14    taken before the Honorable A. JAY CRISTOL, Judge of

15    the above-styled Court, at the time and place stated

16    in the caption thereof.

17

18          WITNESS my hand this 24th day of

19    September, 2009.

20

21

22

23                        _____

24                        LISA E. BROWN

25